**Opinion issued August 16, 2012**



In The

# Court of Appeals

For The

## First District of Texas

———————————

**NO. 01-11-00703-CV**

———————————

**IN THE INTEREST OF D.J.W., A CHILD**

———

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-04338J**

———

**O P I N I O N**

This is an appeal from the termination of the parental rights of a mother,

N.W., with respect to her son, D.J.W. *See* TEX. FAM. CODE ANN. § 161.001 (West

Supp. 2012). On appeal, the mother contends that she received ineffective

assistance of counsel because her trial attorney failed to timely file a statement of

appellate points contesting the sufficiency of the evidence to support the court's

judgment. She argues that the evidence is legally and factually insufficient to support the trial court's findings that she committed four predicate acts required for termination, that termination was in her son's best interests, or that appointment of the Department of Family and Protective Services as conservator was in D.J.W.'s best interest.

The evidence was sufficient to support the judgment. In particular, with respect to the predicate acts necessary to support termination of parental rights under section 161.001(1), the evidence was sufficient to support a determination that the mother engaged in conduct which endangered the physical or emotional well-being of the child. *See id.* § 161.001(1)(E). Accordingly, we affirm.

**Background**

D.J.W. was 17 months old when his parents had their second child, a baby boy. The parents and the two children all lived together in the home of D.J.W.'s maternal grandparents. Two months later, the baby died under circumstances that were quickly determined to be nonaccidental.

On the morning of June 9, 2010, the mother gave the infant a bottle and placed him in his bassinet to sleep. D.J.W. was in another room with his ten-year-old uncle. When the father awoke, he asked the mother to walk to a store with him to buy juice. The father took the baby across the hall, leaving the mother to get dressed. When the father brought the baby back to the mother, she rocked him to

2

sleep and placed him in his bassinet.  After asking some other family members to watch her children, the mother went to the store with the father.

When they came home, the father checked on the infant and told the mother that the baby was "okay" and that he had seen the baby stretching.  A short while later, a visiting cousin told the mother that the infant was sleeping but he had "a little vomit coming from his mouth."  The mother testified that she immediately ran upstairs and noticed that there was blood mixed with the baby's vomit.  She took her child downstairs, where her mother began cardiopulmonary resuscitation, and they called an ambulance.  Shortly after arriving at the hospital, the infant was pronounced dead.

The day after the baby's death, the Department initiated an investigation and, after interviewing family members living in the home, removed D.J.W. from the home and placed him with his great-grandfather.  Meanwhile, an autopsy was performed on the deceased infant.  To facilitate our review of the trial court's judgment, it is necessary to describe the autopsy findings in detail.

The general pathological findings included blunt head trauma and recent and remote skeletal trauma.  An anthropology report prepared in connection with the postmortem examination detailed extensive injuries, including a total of 54 fractures, many of which had occurred one to three weeks prior to the child's death.  Two of the fractures were classic metaphyseal lesions (CMLs) of the distal

radius (wrist) and ulna (forearm). The report explained that a "CML is an injury of the immature long bone metaphysis associated most strongly with infants and toddlers less than three years of age." Both CMLs featured subtly rounded trabeculae and physeal margins, which the report characterized as being "consistent with early bone healing processes." The evidence that the baby had fractures that demonstrated signs of "healing processes" is significant because it supports the autopsy conclusion that the injuries had occurred some period of time prior to the baby's death, such that the healing process would have time to take place.

The remaining 52 fractures were located in a bilateral, serial distribution among the baby's ribs. Eleven serial, healing fractures were observed in a bilateral distribution on the midclavicular region of Rr2-7 and Lr3-7.[1] Eighteen serial, healing avulsion fractures were observed in a bilateral distribution on the heads or

---

[1] All of these fractures were "in the early soft callus stage of healing with visible fracture margins." The fractures of Rr3-7, Lr3, and Lr5-6 were described as "complete and transverse," while "[c]omplete accordion-type fractures" were located on Lr4 and Lr7, and Rr2 was a "buckle fracture." The report observed: "The margins of the transverse fractures and the buckle fracture of Rr2 retain evidence of crushing on the internal surface of the ribs, consistent with bone failure in compression." In addition, the "accordion-type fractures observed in Lr4 and Lr7" were described as "the result of left to right directed compression with an axial load," which resulted in the bone "in tension as the internal and external surfaces splayed apart during compression."

4

necks of Rr3, Rr5-11 and Lr1-10.[2]  Thirteen serial, healing fractures of the costochondral junctions (CCJ) of Rr4-6, Rr8, Rr10, Lr2 and Lr4-10 were observed.[3]  Six acute serial fractures were observed in a bilateral distribution on the midclavicular region of Rr8-10 and Lr8-10.[4]  Finally, four acute fractures of Rr11-12 and Lr11-12 were found.[5]

---

[2]  These were also "complete fractures" with the exception of two "head fractures," which were "incomplete."  The report explained that "[a]vulsion fractures of the rib head and neck are caused when excessive forces are applied to the costovertebral junction while the head is held in place by strong ligament attachments."  "Early healing" was observed "as minimal thickening of the exposed trabeculae and slight rounding of the cortical bone at the fracture margins."

[3]  The report noted that "[t]he sternal ends of the ribs were likely exposed to shearing forces and compression, similar to that found in CML of the long bones."  The severity of these fractures ranged "from crushing and/or fraying of the costochondral rim to fracture of the costochondral surface." Other observations were "consistent with early healing processes."

[4]  Two of these fractures (Rr8-9) were "complete and transverse," and "[c]rushing of the internal margins indicates that the bone failed in compression on the internal surface of the ribs."  The other four fractures (Rr10 and Lr8-10) were "of the accordion type, consistent with compressive forces with an axial load."

[5]  These included one incomplete accordion-type fracture (Rr11), two crushing fractures of the anterior tips of Lr11-12, and "[o]ne complete, transverse fracture located on Lr11."  The report stated that the "fracture of the right rib is consistent with right to left directed compressive force with an axial load component," and that the "fractures of the left ribs are consistent with left to right directed compressive force with an axial load component."

After describing the baby's extensive internal injuries in detail, the report explained that the injuries indicated the child had been seriously injured in "a minimum of two traumatic episodes, one occurring prior to death (antemortem) and one occurring at or very near death (perimortem)." With respect to the "antemortem trauma," the report stated that the observed injuries could have resulted from "[s]haking during constriction of the chest" and "direct traction and torsion of the limb." With respect to the "perimortem trauma," the injuries were described as being "consistent with two impacts to the lower ribs, one from right to left and one from left to right."[6]

---

[6] The report stated:

> *The variation in healing observed on the retained elements is consistent with a minimum of two traumatic episodes, one occurring prior to death (antemortem) and one occurring at or very near death (perimortem).* Fracture healing rates are variable depending on the age and health status of the individual, location and severity of the fracture and possible re-injury. Further, seriation of fracture age based on the stage of healing can be difficult in a young infant because the time span since injury is relatively short.
>
> *The injuries observed in the CML of the distal left radius and ulna, the head and neck avulsion fractures, the midclavicular fractures of Rr2-7 and Lr3-7 and the CCJ fractures of Rr4-5, Rr8, Rr10, Lr2, Lr4-6, and Lr8-10 are consistent with antemortem trauma.* At each fracture site the fracture margins are rounded and exposed trabeculae are thickened. Several fracture sites are also marked with SPNBF [subperiosteal new bone formation]. SPNBF typically occurs in a healthy infant within 4-10 days post-fracture and early soft

Two days after the baby's death, the Department filed its original petition for protection of D.J.W., for conservatorship, and for termination of parental rights. The Department alleged various statutory grounds for termination, including that both parents engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *See* TEX. FAM. CODE ANN. § 161.001(1)(E).

In support of that petition, the Department attached an affidavit of one of its investigators, C. Lightfoot, who informed the trial court of the basic chronology of

callus formation is usually visible radiographically by 10-14 days post-fracture. *The stage of healing observed in these fractures indicates that the injuries occurred approximately one to three weeks prior to death.*

The distribution pattern of the healing fractures throughout the ribcage is consistent with anterior to posterior constriction and posterior levering of the chest. *Shaking during constriction of the chest can result in CML as observed on the distal radius and ulna. These fractures may also be the result of direct traction and torsion of the limb.*

The *perimortem trauma is evident* in the fractures of the anterior body of Rr11 and Lr11-12 (considered to be posterior fractures due to the location of these ribs), and the midclavicular fractures of the lower ribs (Rr8-10, Lr8-10). The fracture margins are sharp and there is no SPNBF on the margins or on the rib bodies. The absence of healing at the fractures indicates that the injuries occurred at or near the time of death. *The distribution pattern and fracture types are consistent with two impacts to the lower ribs, one from right to left and one from left to right.*

(Emphasis supplied.)

7

events, including the investigation by Child Protective Services. An emergency order was entered that day, followed thirteen days later by an adversary hearing with the mother present. As a result of the hearing, the court ordered the Department to conduct a home study, and it ordered both parents to "comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit" and to provide samples for drug, alcohol, and DNA screening. The mother refused to provide a urine sample, which was considered by the drug testing facility as a "refusal/positive test." The results from the hair sample that she did provide showed a positive result for cocaine and marijuana metabolites. At a subsequent hearing, the court entered its "Additional Temporary Orders to Obtain Return of a Child," dated August 2, 2010. In addition to continuing to require that the mother "[c]omplete all services outlined in the DFPS Family Plan of Service filed in this cause," the order specifically required the mother to "[r]emain drug free."

The father ultimately pleaded guilty to criminal charges in connection with the death of the infant, and he voluntarily relinquished his parental rights. The Department pursued its petition to terminate the mother's parental rights as well, and a trial was conducted before an associate judge.

At trial, a caseworker assigned to the matter testified that the Department became concerned because the infant's death was ruled to be a homicide. She

8

testified, "Mom has minimized the reason that the child has come into care. . . . She stated that she did not know how the child was injured and she did not know how the child could have sustained those types of injuries because he was watched at all times and that [she] and the father were the caregiver[s]." She expressed concern about the fact that D.J.W.'s baby brother "was two months old and had 54 fractures to his body." Based upon "the extensiveness of the injuries that the infant had received from the autopsy report and just [the mother's] attitude towards the case and what was going on," and due to the fact that the mother "did not protect the infant from being injured," the caseworker testified that she was "not sure" that the mother "would be able to protect" D.J.W. As she explained, "The agency was concerned about the fact that if a child had that many injuries how, as a mother, you could not know that your child was either being abused or that what, you know, the abuse that led up to the actual incident." The caseworker acknowledged that the mother had not been charged with a crime in connection to the death of her infant son. She nevertheless testified that the Department was seeking termination of the mother's parental rights because it "would be in the best interest of the child."

D.J.W.'s paternal grandmother testified that her other grandson's death caused her to be concerned about the boy being raised by his biological mother. She said, "My problem was my other grandbaby that died in the house. You know,

9

somebody should have seen something was going on with him. To have all those fractures, somebody should have saw [*sic*] that somebody was injuring him."

The mother also testified at trial. She testified that prior to the baby's death, he "didn't have any bruisings, any markings, any shortness of breath, anything that would cause me to have to rush him to the emergency room." She said that she did not ever injure or shake the baby. In response to a question about what she would have done had she known that the father was capable of doing that, she testified:

> He wouldn't have been allowed to be around my kids; and had I known it would have ended in such a manner, this would have progressed more swiftly, more quickly. I wouldn't have had anything, no dealings with him at all.

She said that she did not receive the autopsy report before speaking with the district attorney's office, but after having excerpts read to her, she drew the conclusion that the baby was injured by the father during a period of time when the two were alone. Although she conceded that the father had a "temper" and had raised his voice to her, she said he had "never" been physical with her, thrown anything at her, or hit her.

The Department introduced additional evidence of the mother's drug use through the caseworker's testimony. The caseworker testified that the mother's last positive urinalysis was on June 24, 2010, approximately two weeks after her son died, but the caseworker did not identify which drug was identified in that screening. The mother also had a positive hair follicle test in February 2011, but a

10

negative urinalysis at that time. Again, the caseworker did not say which drug was identified in that screening. She also testified that the mother failed to appear for a drug test in September 2010. When questioned by the attorney ad litem, the caseworker agreed that the mother tested positive for marijuana and cocaine in November 2010.

> Q.     Ma'am, just to clarify, she had a positive drug and urine screen for cocaine and marijuana in November and the test in February was a hair follicle so–and you don't—you are not an expert on that, so you can't tell us—that could have been as a result of the test in November, right?
>
> A.     Yes, sir.

The mother admitted using marijuana, but she flatly denied ever using cocaine. She testified that she began using marijuana when she was 15 or 16 years old and that marijuana was her "drug of choice." She admitted using marijuana during the time when she had custody of her two children, though the record does not clearly show that she used marijuana in their presence. She also admitted using marijuana after the trial court's order that she remain "drug-free," using the drug as late as October 19, 2010. She denied using illegal drugs after that date.

At the conclusion of the trial, the court found by clear and convincing evidence that the mother had endangered D.J.W. by engaging in conduct or knowingly placing him with people who engaged in conduct that endangers a child's physical or emotional well-being. *See* TEX. FAM. CODE ANN.

11

§ 161.001(1)(E).[7] The court also found that termination of her parental rights was in the best interest of the child, *see id.* § 161.001(2), that appointment of a parent or relative of the child as managing conservator would not be in the child's best interest, and that appointment of the Department as sole managing conservator of the child would be in his best interest.

The mother's trial counsel did not timely file a statement of appellate points, *see* TEX. R. CIV. P. 324, or a motion for new trial. However, her appellate counsel filed a motion for new trial and statement of appellate points, though not within 15 days of the trial court's final decree of termination. The trial court denied the motion for new trial, stating on the record that an appeal would not be frivolous.

## Analysis

### I. Ineffective assistance of counsel

The mother contends that she received ineffective assistance of counsel because her trial counsel failed to file a timely statement of appellate points challenging the sufficiency of the evidence to support the grounds on which the

---

[7] The court also found that the mother endangered D.J.W. by knowingly placing or allowing him to remain in conditions or surroundings that endanger a child's physical or emotional well-being, *see* TEX. FAM. CODE ANN. § 161.001(1)(D), that she "contumaciously refused to submit to a reasonable and lawful order of a court under Subchapter D, Chapter 261, Texas Family Code," *see id.* § 161.001(1)(I), and that she "failed to comply with the provisions of a court order that specifically established" the actions necessary for her to obtain the return of D.J.W., *see id.* § 161.001(1)(O).

12

trial court terminated her parental rights.[8]  Texas courts apply the two-pronged analysis of *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2066 (1984), to determine whether trial counsel was ineffective in a proceeding to terminate parental rights:

---

[8]  The Department argues that a change in the law renders N.W.'s ineffective-assistance-of-counsel issue unnecessary and urges this court to proceed directly to a review of the merits of her sufficiency issues. The Family Code provisions that were in effect at the time of the trial court's judgment in this case required a party appealing a final order terminating her parental rights to file a statement of points identifying the issues she wished to raise on appeal. *See* Act of May 22, 2001, 77th Leg., R.S., ch. 1090, § 9, 2001 TEX. GEN. LAWS 2395, 2397–98 (enacting section 263.405), *amended by* Act of May 12, 2005, 79th Leg., R.S., ch. 176, § 1, 2005 TEX. GEN. LAWS 332, 332 (adding subsection 263.405(i)) (former TEX. FAM. CODE ANN. § 263.405), *repealed by* Act of May 5, 2011, 82d Leg., R.S., ch. 75, § 5, 2011 TEX. GEN. LAWS 348, 349. That statute also stated that an "appellate court may not consider any issue that was not specifically presented to the trial court in a timely filed statement of points." *Id.* § 263.405(i).

The Department relies upon statutory revisions enacted before the mother's notice of appeal was filed in the trial court on August 13, 2011. *See* Act of May 5, 2011, 82d Leg., R.S., ch. 75, § 5, 2011 TEX. GEN. LAWS 348, 349 (repealing subsections 263.405(b–1) and 263.405(d)–(i)). However, the final decree of termination was signed on July 25, 2011, and the legislation provided, "This Act takes effect September 1, 2011." *Id*. Thus, to the extent the requirement of a statement of appellate points has been repealed, the repeal had not yet taken effect at the time relevant to this appeal. Thus we will analyze the mother's appeal through the framework of her challenge to the alleged ineffective assistance of her counsel. *See In re S.M.G.*, 07-11-00340-CV, 2011 WL 6217433, at *1 n.3 (Tex. App.—Amarillo Dec. 14, 2011, order) (per curiam); *In re K.N.N.*, No. 09-11-00317-CV, 2011 WL 5989007, at *8 (Tex. App.—Beaumont Dec. 1, 2011, no pet.) (mem. op.); *In re A.S.D.*, No. 02-10-00255-CV, 2011 WL 5607608, at *1 (Tex. App.—Fort Worth Nov. 17, 2011, no pet.) (mem. op ).

13

First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*In re J.O.A.*, 283 S.W.3d 336, 341–42 (Tex. 2009) (citing *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003)).[9]

The mother argues that her trial counsel rendered deficient performance and thus failed the first prong of *Strickland* by not filing a statement of appellate points as required by the Family Code. Not every failure to preserve a challenge to the sufficiency of the evidence rises to the level of ineffective assistance. *See id.* at 343; *In re M.S.*, 115 S.W.3d at 549. We must presume that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that the decision not to challenge the sufficiency of the evidence was based upon counsel's professional opinion that such an appeal was not warranted.

---

[9] The Department also argues that because the mother retained her trial counsel, she may not raise ineffective assistance of counsel on appeal. *See In re V.G.*, No. 04-08-005220CV, 2009 WL 2767040, at *12 (Tex. App.— San Antonio, Aug. 31, 2009) (memo. op.) (parent who was represented by retained counsel rather than counsel appointed pursuant to the Family Code held not entitled to raise claim for ineffective assistance of counsel). In light of our determination that the mother was not harmed by any ineffective performance rendered by her counsel, it is not necessary for us to determine whether this remedy is available in the circumstance of retained (rather than appointed) counsel.

*See In re J.O.A.*, 283 S.W.3d at 343; *In re M.S.*, 115 S.W.3d at 549. With respect to the second *Strickland* prong, which requires a showing of prejudice resulting from the deficient performance of counsel, the mother argues that she was harmed by her attorney's failure to file the statement of points in this case because her challenges to the sufficiency of the evidence are meritorious. In particular, she argues that the evidence was legally and factually insufficient to support the trial court's findings that she committed four predicate acts for terminating her parental rights, that termination was in the best interest of the child, and that appointment of the Department as managing conservator was in the child's best interest.

## II.    Grounds for termination of parental rights

In the context of litigation affecting the parent-child relationship, including proceedings to terminate parental rights, the Legislature has declared that is the public policy of the State of Texas to provide children with "a safe, stable, and nonviolent environment." TEX. FAM. CODE ANN. § 153.001(a)(2) (west 2008). In furtherance of that policy, "the purpose of the State's intervention in the parent-child relationship is to protect the best interests of the children, not to punish parents for their conduct." *In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). A parent's right to the companionship, care, custody, and management of her child is

15

a precious liberty interest of constitutional magnitude,[10] and accordingly, termination proceedings are strictly scrutinized on appeal. *See Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). Protection of the best interests of the child is the primary focus of both the termination proceeding in the trial court and our review on appeal. *See In re A.V.*, 113 S.W.3d at 361.

"[T]he evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008). Because the standard of proof is "clear and convincing," the Supreme Court of Texas has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d 256, 264–66 (Tex. 2002).

The legal sufficiency review in a termination-of-parental-rights case "must take into consideration whether the evidence is such that a factfinder could

---

[10]   *See Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *see also Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 2060 (2000) ("[T]he interest of parents in the care, custody, and control of their children is perhaps the oldest of the fundamental liberty interests recognized by this Court."); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) ("This natural parental right has been characterized as 'essential,' 'a basic civil right of man,' and 'far more precious than property rights.'") (quoting *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212 (1976)).

reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof." *Id.* at 265–66. We "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *Id.* at 266. We review "the evidence in the light most favorable to the judgment," meaning that we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id.* We also "disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id.* "If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient." *Id.*

With respect to our review of the factual sufficiency of the evidence, we consider the entire record, including disputed evidence, to determine "whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the State's allegations." *Id.*; *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.*, 96 S.W.3d at 266.

17

In proceedings to terminate the parent-child relationship brought under Texas Family Code section 161.001, the Department must establish one or more of the acts or omissions enumerated under section 161.001(1) and that termination is in the best interest of the child. TEX. FAM. CODE ANN. § 161.001. Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Only one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d at 362. In this case, the Department sought termination of the mother's parental rights on grounds of endangerment, *see* TEX. FAM. CODE ANN. § 161.001(1)(D) & (E), and for failing to comply with certain court orders, *see id.* § 161.001(1)(I) & (O). In its final order of termination, the trial court expressly found that all four statutory provisions were met, that termination was in the best interest of the child, and that appointment of the Department as managing conservator was in the child's best interest.

**A. Endangerment of a child (Family Code § 161.001(1)(E))**

The mother challenges the trial court's findings that she endangered D.J.W. One of the predicate acts that may result in the involuntary termination of the parental-child relationship is satisfied if the parent has "engaged in conduct or

18

knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE ANN. § 161.001(1)(E). In this context, "endanger" means to expose to loss or injury or to jeopardize. *Boyd*, 727 S.W.2d at 533. The term means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* at 533. To determine whether termination is justified, courts may look to parental conduct both before and after the child's birth. *In re J.O.A.*, 283 S.W.3d at 345. The conduct need not occur in the child's presence, and it may occur "both before and after the child has been removed by the Department." *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied).

Unlike section 161.001(1)(D), which focuses on endangering "conditions or surroundings," section 161.001(1)(E) focuses on parental actions exposing the child to "conduct" which endangers the child's physical or emotional well-being. Section 161.001(1)(E) may be satisfied either by the parent's own endangering conduct or by the parent's knowing placement of the child with other persons who engage in endangering conduct. For purposes of this appeal, we will focus solely

19

upon the mother's own conduct and whether the trial court could have concluded that her conduct endangered D.J.W.[11]

The Supreme Court of Texas has acknowledged that "a parent's use of narcotics and its effect on his or her ability to parent may qualify as an endangering course of conduct." *In re J.O.A.*, 283 S.W.3d at 345. Our court has explained that illegal drug use may support termination under section 161.001(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Walker*, 312 S.W.3d at 617. Endangerment by risks of both impairment and imprisonment are at issue in this case. The mother admitted illegal marijuana use both before and after giving birth to her children, characterizing it as her "drug of choice." In addition to her admitted marijuana usage, the trial court reasonably could have formed a firm belief that the mother also used cocaine based on trial testimony about the result of the mother's drug test at the time of the emergency hearing, which was positive for the presence of cocaine metabolites, her positive cocaine test in November 2010 (after she had already been ordered by the trial court to remain "drug-free"), and her failure or refusal to take drug tests on other occasions.

---

[11] The mother argues that the trial court took improper judicial notice of various documents included in the case worker's file. For purposes of resolving this appeal, our analysis of the sufficiency of the evidence does not rely upon any of this evidence.

Other evidence in the record reasonably could have led the trial court to a firm belief that the mother's drug use affected her ability to parent in light of her professed unawareness of the abuse being inflicted upon her infant child while she was actively providing care. Although the Department failed to present evidence of the frequency of the mother's drug use or direct evidence of the mother's impairment arising from drug use, the evidence did support a conclusion that drug use adversely affected the mother's ability to parent. Based upon the detailed autopsy report, the factfinder reasonably could have concluded that D.J.W.'s brother had died as a result of cruel abuse on multiple occasions, beginning at least one week prior to his death. The father admitted causing the baby's death, and there was no evidence that it was directly caused by the mother. Nevertheless, evidence at trial showed that after the death of the child, the mother claimed to be unaware of how the child could have been injured, despite the fact that the child was "watched at all times" by her and the father. The child's serious injuries resulting from antemortem trauma occurred while under the supervision of the mother approximately one to three weeks before death, and consisted of numerous complete fractures of the ribs. The testimony of both the caseworker and D.J.W.'s paternal grandmother emphasized their concern about the mother's ability to protect the child. To the extent that the undisputed evidence showed that the mother was personally responsible for supervising the child yet completely

21

unaware of the pre-death injuries, the trial court reasonably could have concluded that the mother's admitted drug use affected her parenting abilities by impairing her ability to perceive and protect D.J.W. from the physical and emotional impact of such injuries inflicted in the home by the father.

Unlike *In re J.P.B*, in this case the Department did not present any expert testimony to directly explain the likely cause of the baby's injuries, that a parent should have known that something was wrong with the baby in this circumstance, or that the baby would have reacted in any particular manner such that it should have been noticed by the parents. *See In re J.P.B.*, 180 S.W.3d at 573. This kind of explanatory expert opinion testimony, if available to the Department, ideally would be made part of the record to connect the evidence of child abuse to the parental action (or inaction) alleged by the Department in support of its petition. Nevertheless, we cannot conclude that the lack of such explanatory expert testimony rendered the Department's evidence legally insufficient in this case. In particular, we note the detailed autopsy findings that were admitted into evidence, which stated that the baby's injuries that occurred one to three weeks before his death, including numerous complete fractures of his ribs, could have resulted from "[s]haking during constriction of the chest" and "direct traction and torsion of the limb." The injuries occurring at the same time of the baby's death were "consistent with two impacts to the lower ribs, one from right to left and one from

left to right." In addition, this case involved admitted drug use by the parent before removal of the child at issue, a factor not involved in *J.P.B.*

Finally, we note that the mother in this case also admitted to using marijuana after the removal of her surviving child and after she had been specifically ordered to "remain drug-free." The evidence before the trial court reasonably could have supported a conclusion by the finder of fact that the mother also abused cocaine during this time. Illegal drug use in violation of the court's order in this circumstance endangered D.J.W.'s emotional well-being because it increased the risk that his relationship with his biological mother would be permanently severed. *See Walker*, 312 S.W.3d at 617–18.

Drug use that significantly impairs a parent's ability care for a child jeopardizes the child's physical and emotional well-being. We hold that the evidence in this case was legally sufficient to permit a reasonable factfinder to form a firm belief or conviction that the mother engaged in conduct that endangered D.J.W.'s physical or emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(1)(E); *In re J.O.A.*, 283 S.W.3d at 346 (holding that evidence of admitted drug use before the birth of the children, missed drug tests after removal of children, and a failed drug test between removal and the final hearing, established legal sufficiency of evidence to show endangerment under section 161.001(1)(E)).

23

With respect to the mother's factual-sufficiency challenge, our consideration of disputed evidence relating to the Department's case does not undermine the ability of a factfinder to reasonably form a firm belief or conviction about the truth of the State's allegations. The mother denied using cocaine, but she did not dispute her marijuana usage, and she provided no alternative explanation for her failed drug tests and no excuse for skipping court-ordered drug tests. Moreover, the court, as factfinder, was the sole arbiter of the credibility of the witnesses, and, in light of conflicting testimony from the caseworker, it was not required to believe the mother when she denied having used cocaine. *See In re H.R.M.*, 209 S.W.3d 105, 109 (Tex. 2006). We conclude the evidence was also factually sufficient to support the judgment.

We overrule the mother's issues relating to the legal and factual sufficiency of the evidence to support the trial court's finding of a predicate act pursuant to section 161.001(1)(E). In light of this holding, we need not reach her other issues which relate to the findings of other predicate acts pursuant to section 161.001(1)(D), (I), and (O).

## B. Best interest of the child (Family Code § 161.001(2))

The mother challenges the legal and factual sufficiency of the evidence to support the trial court's finding that termination of the parent-child relationship was in the best interest of D.J.W. However, her brief contains no legal argument in

24

support of these points. Accordingly, the points have been waived. *See* TEX. R. APP. P. 38.1(i).

### III. Conservatorship of the child

In her final issue, the mother challenges the legal sufficiency of the evidence to support the trial court's finding that appointment of the Department as managing conservator of D.J.W. was in his best interest. Her only legal argument is that if it is determined that the Department did not adduce clear and convincing evidence in support of the termination of her parental rights, then the appointment of the Department as managing conservator is not in the best interest of D.J.W. As we have concluded that legally and factually sufficient evidence supports the trial court's decree of termination, the mother has presented no other argument to suggest that the Department should not have been appointed as managing conservator. We overrule this issue.

## Conclusion

We conclude that the evidence was legally and factually sufficient to support a finding that the mother used illegal narcotics both before and after D.J.W. was taken into custody by the Department. This evidence further supported the conclusion that the mother's drug use endangered the physical or emotional well-being of D.J.W., by exposing him to the risks that the mother would be impaired or imprisoned. Accordingly, we affirm the trial court's final decree of termination.

Michael Massengale
Justice

Panel consists of Justices Jennings, Massengale, and Huddle.

Justice Jennings, dissenting