**Opinion issued November 17, 2016**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-16-00561-CV

_____

## IN THE INTEREST OF B.P.E. AND R.W.S.E., AKA R.W.S.E, CHILDREN

---

On Appeal from the 313th District Court
Harris County, Texas
Trial Court Case No. 2015-04383J

---

## MEMORANDUM OPINION

In this accelerated appeal, S.E.C., a mother, challenges the trial court's order terminating her parental rights to her two sons, B.P.E. and R.W.S.E. S.E.C. appeals the trial court's judgment on the grounds that factually and legally insufficient evidence supports the trial court's conclusions that she committed three predicate

acts required for termination and that termination was in her children's best interest. We affirm.

## Background

In July 2015, DFPS filed suit seeking conservatorship and termination of the parental rights of S.E.C., a mother, and R.W.E., a father, with respect to their two sons, B.P.E., born in April 2008, and R.W.S.E., born in October 2013.[1] DFPS asserted that S.E.C. committed one or more of the following acts or omissions:

> 14.1 knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endanger the physical or emotional well-being of the children, pursuant to §161.001(1)(D), Texas Family Code;
>
> 14.2 engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangers the physical or emotional well-being of the children, pursuant to §161.001(1)(E), Texas Family Code;
>
> 14.3 constructively abandoned the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services or an authorized agency for not less than six months and: (1) the Department or authorized agency has made reasonable efforts to return the children to the mother; (2) the mother has not regularly visited or maintained significant contact with the children; and (3) the mother has demonstrated an inability to provide the children with a safe environment, pursuant to §161.001(1)(N), Texas Family Code;

---

[1] R.W.E. voluntary relinquished his parental rights in June 2016 and is not a party to this appeal.

14.4 failed to comply with the provisions of a court order that specifically established the actions necessary for the mother to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the children's removal from the parent under Chapter 262 for the abuse or neglect of the children, pursuant to §161.001(1)(O), Texas Family Code.

DFPS attached to its petition the affidavit of caseworker Cassandra Sampson detailing the facts forming the basis for removal of the children, the parties' CPS history, S.E.C.'s and R.W.E.'s criminal history, and DFPS's conclusions and requested relief. Sampson's affidavit explained that the investigation began on June 16, 2015 when the children's maternal uncle informed DFPS that the children had been in his care for the past three weeks because their grandparents could not take care of them anymore. The uncle stated that S.E.C. is on drugs and had been for a long time and that he took the children to the CPS office because he did not want to release them to S.E.C. He told the DFPS staff member that the children's father was in jail though they had a paternal uncle who would like to have the children placed with him. Seven-year-old B.P.E. informed the staff member that he and R.W.S.E. had been staying with S.E.C. and their grandfather before S.E.C. went to the hospital

3

and that his grandparents did not want them to be in the home because S.E.C. is using drugs.[2]

S.E.C. also spoke to the CPS staff member that day and told him that she was in the hospital because she had a seizure and her children were with her brother. She stated that she was on Xanax and Suboxane for anxiety and pain and that her plan was to place the children with their paternal uncle. She signed an Agreement for Parental Child Safety Placement (PCSP), and the children were released to their paternal uncle, pending the completion of the CPS investigation. The paternal uncle initially agreed to take the children, but he later notified CPS that he could no longer care for them. S.E.C. provided the names of friends of the paternal grandmother as an alternate placement, but they too informed DFPS that they could not care for the children.

With regard to S.E.C. and R.W.E.'s CPS history, the affidavit details that DFPS received a Priority 2 report in April 2013 alleging that S.E.C. had been abusing pills for at least a few years. It notes that B.P.E.'s maternal uncle reported to DFPS that S.E.C. and R.W.E. were both on pills at B.P.E.'s fifth birthday party. R.W.E. was said to have been stumbling and falling and S.E.C. was said to have been sitting like a zombie. The report specifies that S.E.C. was observed buying pills and

---

[2]   B.P.E. first stated that he was not sure whether his mother was using drugs but later told the case worker that he was sure that his mother was not using drugs.

slurring and that there had allegedly been 30 to 40 calls of domestic violence from the residence. The section states that the house is sometimes "trashed." The affidavit explains that the case was then referred to Family Based Safety Services from May 2013 to April 2014. S.E.C. and R.W.E. were ordered to participate in substance abuse treatment. S.E.C. successfully completed treatment but, due to being in jail, R.W.E. did not and was ordered to complete his services during probation.

According to Sampson's affidavit, DFPS received another Priority 2 report in October 2013 specifying that R.W.E. had a seizure and that test results revealed R.W.E. had taken Xanax without a prescription. R.W.E. received the pills from S.E.C. who had a prescription. The case was closed and addressed in the open Family Based Safety Services case.

Next, Sampson's affidavit reflects that in March 2014, DFPS received another Priority 2 report indicating that then seven-year-old B.P.E. walked to school with no shirt or socks on in thirty degree weather. The report notes that B.P.E. wore dirty clothes to school before and that he often claims S.E.C. is asleep when he leaves to walk to school. B.P.E. claimed he did not have anything to eat at home and eats breakfast, lunch and a snack at school. According to the affidavit, "the children appear dirty and unkempt most of the time and frequently have lice."

In October 2014, DFPS received a report that R.W.E. was in jail. The report noted that R.W.E. uses heroin and S.E.C. uses Xanax and the maternal grandmother and her boyfriend use crack and "whatever else they can get their hands on." The allegations were ruled out for S.E.C. She tested negative for drugs, and the case was closed.

In the Conclusions and Requested Relief section, the affidavit notes that S.E.C. tested positive for benzodiazepine and cocaine in a June 2015 urinalysis and amphetamines, methamphetamines, and cocaine in a June 2015 hair follicle test and that she has a long history of drug use and a history with the agency. It reflects DFPS's opinion that there is an "immediate and continuing danger to the physical health or safety of the children if they were returned to the care of the parents" and that "reasonable efforts . . . were made to prevent and/or eliminate the need to remove the children," and "that there was not time, consistent with the circumstances and providing for the safety of the children, for an emergency hearing prior to taking possession of the children."

In July 2015, four days after DFPS filed its petition, S.E.C. filed a letter with the court. In it, S.E.C. contended that she has never had a problem providing her children with food and clean clothes. She acknowledged that she had a problem with drugs in the past and stated that she was detoxing in June 2015 when she was hospitalized for a seizure. According to the letter, S.E.C.'s brother notified her when

she was in the hospital that their parents had left the children with him because they could no longer take care of them. S.E.C. stated that she immediately left the hospital and tried to have her brother take the children to their paternal uncle's house, however, he took them to CPS. According to S.E.C, she made repeated efforts to call CPS to speak to and visit the children. She noted that she has a job at Sonic and also applied to a job at Home Depot, is trying to go to AA classes, and looking for an apartment. S.E.C. stated that she has been on benzodiazepine since she was thirteen years old "due to being raised in an abusive home and raped as a child and diagnosed with an irregular heartbeat." She contended that she wanted to be involved as much as possible with the children until they could return home.

Thereafter, the court held an initial hearing in which it found that there was sufficient evidence that:

> (1) there was a danger to the physical health or safety of the children which was caused by an act or failure to act of the person entitled to possession and for the children to remain in the home is contrary to the welfare of the children; (2) the urgent need for protection required the immediate removal of the children and makes efforts to eliminate or prevent the children's removal impossible or unreasonable; and (3) notwithstanding reasonable efforts to eliminate the need for the children's removal and enable the children to return home, there is a substantial risk of a continuing danger if the children are returned home.

Accordingly, the court ordered the appointment of DFPS as the temporary managing conservator of B.P.E. and R.W.S.E. The court also ordered S.E.C. to submit to a

drug test on that date and it was positive for methamphetamine, alprazolam, and clonazepam. Pursuant to section 263.106 of the Texas Family Code, the court ordered S.E.C. to comply with each requirement set out in DFPS's Family Service Plan (the "Plan") which S.E.C. acknowledged in August 2015. The Plan laid out goals, tasks, and services that S.E.C. was to complete. Among them, S.E.C. was to refrain from engaging in criminal activities, submit to random drug screenings, and participate in a substance abuse assessment.

In December 2015, DFPS filed a status report with the court stating that S.E.C. was in a treatment facility in California and R.W.E. was released from prison. According to the report, the children were placed with a paternal relative in Minnesota. DFPS requested that it remain temporary managing conservator and that a permanency hearing be held in four months.

In June 2016, the court held a bench trial of this matter. Cheryl Carver, the caseworker assigned to B.P.E. and R.W.S.E.'s case since October 2015, testified on behalf of DFPS. Carver testified that the children first came into care due to "neglectful supervision" and that this was a "family based safety service case" in which drugs were an issue. She explained that, to her knowledge, S.E.C. had not completed any of the terms of the Plan in the nine months leading up to trial. She stated that S.E.C. had not visited her children at all during this time and had only spoken to them by phone until December 2015 after which she stopped calling them

as scheduled. Carver noted that, though S.E.C. was not aware of it, the children's therapist recommended that they refrain from speaking to her because their conversations disrupted the children's behavior.

Carver testified that S.E.C. was required to submit to drug testing as part of the family service plan. She stated that S.E.C. had been tested multiple times throughout the pendency of the case and had tested positive for a number of different drugs including methamphetamines. S.E.C. was also tested numerous times during DFPS's involvement before suit was filed. During trial, the court admitted the results of S.E.C.'s drug tests from 2013 to 2015. They reflect:

- S.E.C. tested positive for marijuana on April 18, 2013;

- S.E.C. tested positive for benzodiazepine on August 28, 2013;

- S.E.C. tested positive for benzodiazepine (alprazolam metabolite), hydrocodone, and hydromorphone on February 25, 2014;

- S.E.C. tested positive for benzodiazepine on October 31, 2014, however, based on a valid medical explanation the positive result was changed to negative for illicit drug use;

- S.E.C. tested positive in a hair test for amphetamines, methamphetamines, and cocaine, and in a second urine specimen for benzodiazepine and cocaine on June 30, 2015;[3]

- S.E.C. provided three specimens that tested positive on July 29, 2015—the first tested positive for methamphetamine, clonazepam, benzodiazepine (alprazolam metabolites), and cocaine metabolites, the second (a hair specimen test) tested positive for amphetamine, methamphetamine, and two cocaine metabolites (benzoylecgonine and cocaine), and the third specimen tested positive for ethyl glucuronide and ethyl sulfate;

- Finally, S.E.C. provided three specimens for testing on September 16, 2015—the first (a hair specimen) tested positive for marijuana, marijuana metabolite, and three cocaine metabolites (benzoylecgonine, cocaine, and norcocaine), the second specimen tested positive for benzodiazepine (alprazolam metabolites) and high for cocaine metabolite, and the third showed a positive result for ethyl sulfate but was invalidated for reasons not stated.

---

[3] The first urine specimen collected on this date was invalidated for being outside of the normal temperature range so a second urine specimen was taken under direct supervision.

Carver testified that based on results of the drug tests, she formed the opinion that S.E.C. had engaged in conduct that endangered the physical or emotional well-being of her children. She opined that termination was in the best interest of the children in light of S.E.C.'s continued drug use even after her children went into DFPS care, her continued engagement in criminal activity, and her failure to comply with the Plan.

Carver explained that the children had been placed with their paternal relative (R.W.E.'s sister) in Minnesota, who was meeting the children's physical and emotional needs and wanted to adopt B.P.E. and R.W.S.E. She noted that the children were doing well in school and B.P.E. in particular had shown a lot of improvement. Carver explained that R.W.E.'s sister and her husband had been screened and licensed for foster care, that she saw no impediments to adoption, and that it would be in the best interest of the children to remain connected with the birth family but have two responsible parents.

The children's guardian ad litem likewise testified that it was in the children's best interest to remain with their paternal aunt in Minnesota. He requested to remain on the case to see it through the adoption process.

In closing, S.E.C.'s counsel asked the court to allow him to try to obtain a relinquishment from S.E.C. before entry of the order. In the alternative, he argued that though S.E.C.'s conduct endangered the children before they went into DFPS

11

care, the court should not consider S.E.C.'s subsequent conduct because S.E.C. acted in their best interest when she told DFPS about potential placements.

The trial court terminated S.E.C.'s parental rights pursuant to section 161.001(b)(1)(D), (E), and (O) of the Texas Family Code. S.E.C. appealed.

## Discussion

In her first, second, and third issues, S.E.C. asserts that the evidence was legally and factually insufficient to support the termination of her parental rights under Texas Family Code sections 161.001(b)(1)(D), (E), or (O), respectively. In her fourth issue, S.E.C. challenges the trial court's determination that termination of her parental rights was in the children's best interest.

### A.    Standard of Review

In a case to terminate parental rights under section 161.001, DFPS must establish by clear and convincing evidence: (1) that the parent committed one or more of the enumerated acts or omissions justifying termination and (2) that termination is in the best interest of the child. TEX. FAM. CODE § 161.001; *In re C.H.*, 89 S.W.3d 17, 23 (Tex. 2002). "Clear and convincing evidence" is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009).

In conducting a legal-sufficiency review in a parental-rights-termination case brought by DFPS, we must look at the entire record to determine whether the evidence, viewed in the light most favorable to the finding, is such that a reasonable factfinder could have formed a firm belief or conviction about the truth of the matter on which DFPS had the burden of proof. *In re J.O.A.*, 283 S.W.3d at 344–45 (citing *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). We "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id*. at 344.

In conducting a factual-sufficiency review, we view all of the evidence, including disputed or conflicting evidence. *Id*. at 345. We should consider whether the disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The evidence is factually insufficient only if, "in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" regarding the finding under review. *In re J.O.A.*, 283 S.W.3d at 345 (quoting *In re J.F.C.*, 96 S.W.3d at 266).

DFPS bore the burden at trial to establish that the parent committed one of the acts or omissions enumerated in section 161.001(b)(1) and that termination is in the

13

best interest of the child.  *See* TEX. FAM. CODE § 161.001; *In re C.H.*, 89 S.W.3d at 23.  Termination may not be based solely on the best interest of the child as determined by the trier of fact.  *Tex. Dep't of Human Servs. v. Boyd,* 727 S.W.2d 531, 533 (Tex. 1987).  However, "[o]nly one predicate finding under section 161.001(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.,* 113 S.W.3d 355, 362 (Tex. 2003).  "Thus, if multiple predicate grounds are found by the trial court, we will affirm on any one ground because only one is necessary for termination of parental rights." *In re T.G.R.-M.*, 404 S.W.3d 7, 13 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (citations omitted).

## B.      Termination under Section 161.001(b)(1)(E)

### 1.      Applicable Law

Texas Family Code subsection 161.001(b)(1)(E) provides that a parent's rights can be terminated when she has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child."  TEX. FAM. CODE § 161.001(b)(1)(E).  Under subsection (E), "[t]he relevant inquiry is whether evidence exists that a parental course of conduct endangered the child's physical or emotional well-being." *Jordan v. Dossey,* 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).  In this context, endanger means "to expose to loss or injury or to jeopardize." *In re*

*D.J.W.*, 394 S.W.3d 210, 220 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (citing *Boyd,* 727 S.W.2d at 533)). The term means "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but "it is not necessary that the conduct be directed at the child or that the child actually suffers injury." *Id.* (quoting *Boyd,* 727 S.W.2d at 533). "The conduct need not occur in the child's presence, and it may occur both before and after the child has been removed [from the home] by the Department." *Id.* (quoting *Walker v. Tex. Dep't of Family & Protective Servs.,* 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied)). Our Court has held that illegal drug use may support termination under section 161.001(b)(1)(E) because "it exposes the child to the possibility that the parent may be impaired or imprisoned." *Id.* at 221; *Walker,* 312 S.W.3d at 617.

### 2. Analysis

S.E.C. argues that DFPS failed to prove that S.E.C. engaged in conduct that endangered the well-being of the children as required to make a predicate finding under section 161.001(b)(1)(E). She asserts that her last drug test was in September 2015, nine months before trial; thus, there is no evidence to prove she used drugs from October 2015 through the time of trial. She contends that, "[m]ore importantly,

15

DFPS failed to provide evidence to prove that drugs were an endangerment to the well-being of her children."[4]

The Supreme Court has explicitly held that, when conducting an analysis under section 161.001(b)(1)(E), "endangering conduct may include the parent's actions before the child's birth, while the parent had custody of older children, including evidence of drug usage." *In re J.O.A.,* 283 S.W.3d at 345. Under this reasoning, S.E.C.'s repeated drug use while she had custody of B.P.E. and R.W.S.E., before and after R.W.S.E. was born, and after DFPS removed the children from her home is evidence of endangerment. *See id.*; *see also In re D.J.W.*, 394 S.W.3d at 221; *Walker,* 312 S.W.3d at 617.

The undisputed evidence at trial established that B.P.E. was born in April 2008 and R.W.S.E. in October 2013. S.E.C.'s history with DFPS dates back to April 2013 when her brother reported her drug abuse to DFPS, at which time she had custody of B.P.E. but R.W.S.E. was not yet born. S.E.C. then failed a drug test in August 2013, when she was pregnant with R.W.S.E., who was born two months later. S.E.C. failed another drug test in February 2014 when R.W.S.E. was an infant and B.P.E. was five years old. Thereafter, DFPS received a report of child neglect

---

[4] Notably, here, DFPS filed a status report with the court in December 2015 stating that R.W.S.E and B.P.E.'s caregiver believed R.W.S.E. was developmentally delayed and B.P.E. had been diagnosed with PTSD and anger reactive attachment and was behind in school but was getting the necessary help.

after B.P.E. walked to school with no shirt or socks on in freezing weather, stating that the children were dirty and unkempt and frequently had lice. On June 16, 2015, S.E.C.'s brother took the children to DFPS based on his concern regarding S.E.C.'s ongoing drug use. The children were released to their paternal uncle's custody. Nevertheless, two weeks later, S.E.C. tested positive for methamphetamine, amphetamine, cocaine, and benzodiazepine, when R.W.S.E. was not even two years old and B.P.E. was seven. DFPS filed a petition seeking conservatorship of S.E.C.'s children and termination of her parental rights on July 21, 2015. Eight days later, S.E.C. again tested positive for amphetamine, methamphetamine, clonazepam, cocaine, benzodiazepine, ethyl glucuronide and ethyl sulfate. After DFPS was appointed temporary managing conservator of S.E.C.'s children and S.E.C. agreed to comply with the terms of the family service plan, she again tested positive for drugs in September 2015. S.E.C. did not present any evidence to dispute the positive drug test results or her history of encounters with DFPS.

The Texas Supreme Court has held that "endangering conduct is not limited to actions directed toward the child." *In re J.O.A.,* 283 S.W.3d at 345. Rather "[e]vidence of narcotics use and its effect on a parent's life and ability to parent may establish that the parent has engaged in an endangering course of conduct." *Walker*, 312 S.W.3d at 618; *Toliver v. Tex. Dep't of Family & Protective Servs.*, 217 S.W.3d 85, 98 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see also Vasquez v. Tex. Dep't*

17

*of Protective & Regulatory Servs*., 190 S.W.3d 189, 195–96 (Tex. App.—Houston [1st Dist.] 2005, pet. denied) (terminating parental rights despite there being no direct evidence of parent's continued drug use actually injuring child). Here, DFPS received at least six reports regarding S.E.C. over approximately two years. Despite DFPS's sustained involvement with S.E.C., she continued to test positive for narcotics use—twice in the months before R.W.S.E. was born when she had custody of B.P.E., again when R.W.S.E. was just a few months old in February 2014, two more times after her children were removed from her custody in June 2015, and again in September 2015 after DFPS was granted conservatorship over her children and after S.E.C. had agreed to the terms of the Plan. Her continued drug use exposed B.P.E. and R.W.S.E. to the possibility that she may be impaired or imprisoned and evidenced a course of conduct which endangers the children's physical and emotional well-being. *See Walker*, 312 S.W.3d at 617.

Considering all of the evidence in the light most favorable to the judgment, we conclude that a factfinder could reasonably have formed a firm conviction or belief that S.E.C. engaged in conduct which endangered the physical and emotional well-being of her children. Thus, we find the trial court's endangerment finding under section 161.001(b)(1)(E) is supported by legally sufficient evidence.

In reviewing the factual sufficiency of the evidence, we consider all of the evidence, including disputed and conflicting evidence. In her letter to the court,

18

S.E.C. contended that she has been on benzodiazepine since she was a child, however, she did not allege or present evidence that she had a valid prescription for this medication. Even assuming that one exists, S.E.C. does not dispute her other continued illicit drug use—while she was pregnant, when she had an infant, when she knew her parental rights were in jeopardy, and even after her children were removed from her custody. S.E.C. also expressed her desire to maintain contact with her children and regain custody. However, the undisputed evidence establishes that she only had sporadic contact with the children for six months following their removal from her custody, after which she stopped calling them as scheduled. Additionally, while DFPS's December 2015 status report states that S.E.C. was enrolled in treatment in California, there is no evidence that she completed such treatment. Rather, DFPS presented evidence at trial that S.E.C. did not comply with any of the terms of the Plan and S.E.C. presented no evidence to dispute DFPS's contention. Finally, S.E.C. does not contend that she has stopped using drugs but rather that the last drug test was conducted nine months before trial and thus, the evidence was insufficient to support a finding of endangerment. However, the trial court was not required to ignore her history of narcotics use merely because she had not been tested in the few months before trial. *See Cervantes–Peterson v. Tex. Dep't of Family & Protective Servs.,* 221 S.W.3d 244, 254 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (noting that trial court was not required to ignore mother's

history of narcotics use merely because she testified that it had abated before trial); *In re R.W.*, 129 S.W.3d 732, 741 (Tex. App.—Fort Worth 2004, pet. denied) (holding that where father maintained he had not consumed alcohol for at least seven to eight months before termination hearing, factfinder was not required to ignore long history of dependence and destructive behavior where evidence established that past substance abuse was more than just "remote and isolated incidents"). Thus, viewing all the evidence presented, including any disputed or conflicting evidence, we find that a reasonable factfinder could have resolved the disputed evidence in favor of a finding that S.E.C. engaged in conduct that endangered the physical and emotional well-being of her children. Accordingly, we overrule S.E.C.'s issues relating to the legal and factual sufficiency of the evidence to support the trial court's finding of a predicate act pursuant to section 161.001(b)(1)(E). In light of our holding, we need not reach her other issues which relate to the trial court's findings of other predicate acts pursuant to section 161.001(b)(1)(D) and (O).

## C. Best Interest of the Children

### 1. Applicable Law

There is a strong presumption that the best interest of a child is served by preserving the parent-child relationship. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976). In assessing whether termination is in a child's best interest, the courts are guided by the non-exclusive list of factors set forth in *Holley v. Adams*, 544

S.W.2d 367, 371–72 (Tex. 1976).  The factors include (1) the desires of the child, (2) the emotional and physical needs of the child now and in the future, (3) the emotional and physical danger of the child now and in the future, (4) the parental abilities of the individuals seeking custody, (5) the programs available to assist these individuals to promote the best interest of the child, (6) the plans for the child by these individuals or by the agency seeking custody, (7) the stability of the home or proposed placement, (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not proper, and (9) any excuse for the acts or omissions of the parent.  *Id*.  These factors are not exhaustive.  *In re C.T.E.*, 95 S.W.3d 462, 466 (Tex. App.—Houston [1st Dist.] 2002, pet. denied).  Additionally, DFPS "need not prove all of the factors as a condition precedent to parental termination, 'particularly if the evidence were undisputed that the parental relationship endangered the safety of the child.'"  *Id*. (quoting *In re C.H*., 89 S.W.3d 17, 27 (Tex. 2002)).  However, the burden is on DFPS to rebut the presumption that the best interest of the child is served by keeping custody in the natural parents.  *Vasquez*, 190 S.W.3d at 196.

### 2.    Analysis

S.E.C. contends that the evidence is insufficient to prove the termination of her parental rights is in the best interest of B.P.E. and R.W.S.E.  She asserts that DFPS placed the children with R.W.E.'s sister in Minnesota, making it impossible

for her to complete her Plan and continue a relationship with her children. DFPS disagrees, arguing that the *Holley* factors weigh in favor of termination. While evidence of the desires of the children was not presented by any party at trial, we weigh the evidence in light of the other *Holley* factors.

Under the second and third *Holley* factors, we consider the children's physical and emotional needs and the emotional and physical danger of the children, now and in the future. 544 S.W.2d at 371–72. Section 263.307 of the Texas Family Code admonishes that "prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." B.P.E. and R.W.S.E. are currently residing with their paternal aunt and her husband in Minnesota. Carver testified that the paternal aunt and her husband are fulfilling B.P.E. and R.W.S.E.'s emotional and physical needs and would like to adopt them. Both children are doing well in school and B.P.E.'s performance, in particular, has improved. The children's therapist recommended that B.P.E. and R.W.S.E. not have contact with S.E.C. because it interfered with their behavior. Conversely, there is no evidence that S.E.C. is drug-free or is otherwise able to provide a safe home, free of hazards for the children. Additionally, evidence of past parental misconduct or neglect can be used to measure a parent's future conduct. *See In re A.M.*, 385 S.W.3d 74, 82 (Tex. App.—Waco 2012, pet. denied); *Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied). Thus, the evidence discussed in support of the

trial court's finding under section 161.001(b)(1)(E), is probative of a finding as to potential danger in determining the children's best interest. *See Walker*, 312 S.W.3d at 619; *see also Robinson v. Tex. Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 688 (Tex. App.—Houston [1st Dist.] Houston 2002, no pet.) (finding pattern and practice of drug abuse to be sufficient evidence to support best-interest finding); *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.) (finding pattern of illegal drug use suggested mother was not willing and able to provide child with safe environment—a primary consideration in determining child's best interest).

With respect to factors four, six, and seven, which relate to the parental abilities of the individuals seeking custody, their plans for the children, and the stability of the home or proposed placement, Carver testified that she is in contact with the paternal aunt and a caseworker who is working with the family in Minnesota and that she has received periodic reports. She testified that the children are both doing well in school and B.P.E. has "really improved" and that the paternal aunt and her husband are fulfilling B.P.E. and R.W.S.E.'s emotional and physical needs. Carver explained that the paternal aunt and her husband have successfully been screened and licensed for foster care and would like to adopt B.P.E. and R.W.S.E. The children's guardian ad litem stated that it would be in the best interest of the children to remain in Minnesota with their paternal relatives and he offered to remain

23

on through the adoption process. No evidence regarding S.E.C.'s living situation was presented at trial. Likewise, there is no evidence that S.E.C. has complied with the terms of DFPS's Plan. Rather, the evidence reflects that S.E.C. failed drug tests while pregnant, while caring for infant children, and even after she knew her parental rights were in jeopardy and her children had been removed from her custody. S.E.C. also failed to remain in contact with B.P.E. or R.W.S.E. six months after they were removed from her custody and placed with paternal relatives in Minnesota.

Next, there is limited evidence in the record regarding the fifth *Holley* factor— programs available to assist S.E.C. in promoting the best interest of the children. However, according to the Plan, S.E.C. was required to receive individual counseling to address parenting skills and participate in a substance abuse assessment. There is no evidence that she has complied with either of these requirements.

Finally, we consider the eighth and ninth *Holley* factors, which concern the acts or omissions of the parent that may indicate that the existing parent-child relationship is not a proper one and any excuse for such acts or omissions. S.E.C. contends that she could not complete the terms of the DFPS Plan because her children were in Minnesota. However, many parts of the Plan could be completed by S.E.C. despite the children being out of state, i.e., obtaining a legal and verifiable means of providing for her child, attending NA/AA meetings, participating in

24

individual counseling, participating in a psychological evaluation and following all recommendations, and refraining from engaging in criminal activities. There is no evidence that S.E.C. made any effort to complete any task in the Plan. Rather, the evidence establishes that even after DFPS was granted temporary conservatorship of her children and S.E.C. had agreed to abide by the terms of the Plan, she tested positive for drugs. Additionally, S.E.C.'s infrequent contact with the children once they were removed from her custody disrupted the children's behavior. Furthermore, approximately six months after the children were removed from her custody, S.E.C. stopped making regularly scheduled calls to them.

After considering the entire record, we find that the trial court could have reasonably formed a firm belief or conviction that termination of S.E.C.'s parental rights was in the best interest of B.P.E. and R.W.S.E. Therefore, we hold that legally and factually sufficient evidence supports the trial court's finding that termination of S.E.C.'s parental rights is in the best interest of B.P.E. and R.W.S.E. *See In re A.C.*, 394 S.W.3d at 642–43 (finding factually and legally sufficient evidence that termination was in best interest of child where mother used illegal drugs during her pregnancy, after undergoing a treatment plan, and a month after her child was removed and no *Holley* factor weighed in her favor); *Robinson,* 89 S.W.3d at 688–89 (termination in children's best interest where mother continued to use drugs and failed to offer evidence that she had resources to provide suitable home for children);

25

*see also Cervantes–Peterson,* 221 S.W.3d at 253–54 (holding that continued illegal drug use during pregnancy and after child's removal when parental rights were in jeopardy may be considered endangering course of conduct critical to determination that termination is in best interest of child); *In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.) ("A parent's drug use, inability to provide a stable home, and failure to comply with a family service plan support a finding that termination is in the best interest of the child.").

Accordingly, we overrule S.E.C.'s final issue.

## Conclusion

We affirm the trial court's final decree of termination.

Rebeca Huddle
Justice

Panel consists of Justices Massengale, Brown, and Huddle.