

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-18-00206-CV

———————————————

IN THE INTEREST OF I.L., A CHILD

---

On Appeal from the 393rd District Court
Denton County, Texas
Trial Court No. 17-4361-393

---

Before Kerr, Pittman, and Birdwell, JJ.
Memorandum Opinion by Justice Birdwell

**MEMORANDUM OPINION**

Appellants J.A.F. (Mother) and D.L. (Father) appeal the trial court's order terminating their parental rights to their son, I.L. (Isaiah).[1] In five issues, Mother and Father contend that the evidence is legally and factually insufficient to support statutory grounds for termination. We affirm.

**Background**

Mother and Father have a history of using illegal drugs. Father has used marijuana and methamphetamine. Mother has used methamphetamine and has taken prescription drugs for which she does not have a prescription. The parents' drug abuse continued during the litigation of this case in the trial court. According to Mary Harrison, a court-appointed special advocate (CASA), Father said that he "wanted to get off drugs" but that he had continued to use drugs during the case brought by the Department of Family and Protective Services (the Department). Harrison testified that Mother likewise admitted to using drugs during the Department's case.

Mother and Father also have a pattern of engaging in domestic violence. According to Harrison, Mother and Father admitted to physically, emotionally, and

---

[1]To protect I.L.'s anonymity and privacy, we use pseudonyms to refer to him and to other individuals associated with this appeal. *See* Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2018); Tex. R. App. P. 9.8(b)(2).

verbally abusing each other.[2] They told Harrison that they had "hit each other" and that they had "slapped each other around."

Mother and Father have each engaged in criminal conduct. Father has a 2015 conviction for a domestic assault and a 2015 conviction for criminal trespass. He was confined in late 2017, during the pendency of this case, on a charge for possessing a controlled substance, and that charge was still pending at the time of the termination trial. Mother has a December 2017 conviction for failure to identify.

Mother gave birth to Isaiah in March 2017.[3] Upon his birth, while he was still at the hospital, Mother and Father engaged in an argument over his name that became severe enough that hospital officials threatened to make Father leave. Near the end of March 2017, when Isaiah was still an infant, Mother and Father placed him with M.W. (Grandmother), Isaiah's paternal grandmother, and K.W. (Grandfather), Father's stepfather. When the parents initially left Isaiah with Grandmother and Grandfather over a weekend, they said that they were going "job hunting" on the following Monday and that they would retrieve Isaiah on Tuesday. They never did so. Isaiah continued to live with his grandparents. When the grandparents attempted to take Isaiah to the doctor, they could not because they did not have proper documents. In

---

[2]Harrison's testimony belies the parents' assertion on appeal that the record contains "no evidence . . . that domestic violence occurred between the parties."

[3]Isaiah is Mother's second child and Father's first child. Mother's older child does not live with her.

3

the middle of 2017, after Mother and Father had lived for a short time with friends at an apartment, they became homeless and started living in a tent behind a Wal-Mart store.

In May 2017, the Department received a referral about Isaiah. Latisha Walker, an investigator with the Department, learned of allegations that the parents were using illegal drugs, were homeless, and were not taking care of Isaiah. When Walker contacted Father, Father admitted to smoking marijuana but "declined to admit to [using] any other drugs." Mother admitted to one of the Department's employees that she had recently used methamphetamine. Mother and Father denied that they needed treatment for their drug use. The Department learned that the grandparents were facing difficulties in obtaining medical treatment for Isaiah.

The Department filed a petition seeking termination of the parents' rights to Isaiah if their reunification with him could not be achieved. To the petition, the Department attached an affidavit that recited facts concerning the parents' drug use; their lack of a permanent home; their unemployment that resulted in their poverty; their history of engaging in domestic violence; and the grandparents' need for the Department's involvement so that Isaiah could benefit from services.

In June 2017, the trial court held an adversary hearing, but the parents did not attend. The trial court found that allowing Isaiah to reside with his parents would be contrary to his welfare, and the court named the Department as his temporary managing conservator. The court ordered the parents to complete several services,

4

including a psychological evaluation, counseling, and parenting classes. The court also ordered the parents to pay child support and to submit to drug tests when asked by the Department. Finally, the court ordered them to comply with every requirement set forth by any service plan that the Department filed during the suit.

In August 2017, Harrison informed the trial court that Mother and Father were participating in some services that the trial court had ordered but were not consistently participating in other services. In a report that she filed, she wrote,

> [Mother] has been slow to initiate services[.] [S]he was homeless at the beginning of this case, but [she] reports she is currently living at a shelter. . . .

> [Father] has been slow to initiate services[;] he is currently homeless and states he does not have any support. [Father] reported to CASA that he went to MHMR seeking medication . . . and that he had suicidal ideations two days prior to his appointment. He was not given any medication during that visit, and he did not make an appointment to return. CASA learned from the CPS caseworker that MHMR offered in-patient services for [Father], but he refused.

The Department filed a family service plan. The service plan required the parents to, among other tasks, consistently visit Isaiah, remain sober, complete parenting classes, participate in drug counseling meetings, provide financial support for Isaiah, submit to drug screenings, and maintain employment and housing.

In December 2017, the Department filed a report to inform the trial court about Isaiah's well-being in his grandparents' care and about the parents' compliance with services. The Department stated that Isaiah was happy and flourishing in the grandparents' care. The Department informed the trial court that the parents had not

5

been engaging in services and had not been regularly attending visits. The same month, after holding a permanency hearing, the trial court signed an order in which the court found that Mother and Father had not appropriately complied with the service plan.

During the course of the Department's case, Mother and Father were each confined in jail, were released, and began living in San Antonio. At the time of trial, the parents were living in separate San Antonio shelters.

The trial court held a bench trial in April 2018. Mother and Father did not attend the trial. Neither of them had seen Isaiah for months leading up to the trial. Grandmother testified that she had recently spoken with Father, that he and Mother were still living in San Antonio, and that the parents knew of the termination trial. When Grandmother was asked whether Isaiah would have recognized Mother and Father if they had attended the trial, she replied, "I don't think so."

Ashton Moore, a caseworker with the Department, testified about the parents' minimal compliance with requirements of the service plan. Moore said Mother had completed a domestic violence course, but she opined that Mother had not benefited from the course because she had "stayed with her abuser." Moore testified that Mother had failed to complete a psychological evaluation and parenting classes; that Mother had not provided child support; that neither Mother nor Father had visited Isaiah regularly; that Mother had not provided proof of employment or stable housing; and that Mother had failed to take random drug tests. Moore also testified

6

that Mother never called to ask about Isaiah. Moore stated that a "large portion of [Mother's] case was her methamphetamine use, and she hasn't addressed that at all." Concerning Father, Moore testified that she had not received certificates of completion with respect to any of his services and that she had not received proof of his employment, stable housing, or child support payments.

Moore testified that at the time of trial, Mother and Father were still in a romantic relationship. She explained, "Our understanding is they are in a relationship with one another, but his shelter only takes males and her shelter only takes females, unless they [are] with a child." She stated that she had attempted to contact Father through his shelter but that the shelter would not "release any information" to the Department. She also testified that she had attempted to contact Mother through her shelter. She testified, "We [attempted] to call the homeless shelters that they were believed to be in. We let CASA know to have [the parents] contact us if they contacted CASA, and we let [Father's] parents know, as well."

After considering the parties' evidence, the trial court terminated Mother's and Father's parental rights to Isaiah.[4] The court found that termination was in Isaiah's

---

[4]At the end of the bench trial, in explaining its decision to terminate the parents' parental rights, the trial court stated,

> The parents have chosen to let the paternal grandparents be the parents, and I see no reason to thwart that own judgment call by the parents . . . .
>
>     . . . .

best interest and that the parents had (1) voluntarily left him alone or in the possession of another without providing adequate support and while remaining away for at least six months, (2) knowingly allowed him to remain in conditions or surroundings that endangered his physical or emotional well-being, (3) engaged in conduct that endangered his physical or emotional well-being, and (4) failed to comply with a court order that established acts necessary for them to obtain his return after the Department had maintained temporary managing conservatorship over him for at least nine months because of their abuse or neglect.[5] The parents appealed.

## Evidentiary Sufficiency

In five issues, the parents contend that the evidence is legally and factually insufficient to satisfy the requirements for termination of their parental rights under section 161.001(b) of the Texas Family Code.[6] In their first four issues, they raise evidentiary-sufficiency arguments concerning grounds for termination under section

. . . [F]undamentally we have two people that are willing to provide a permanent and stable environment for this child, and the parents simply cannot or will not or some combination thereof.

[5]*See* Tex. Fam. Code Ann. § 161.001(b)(1)(C)–(E), (O), (b)(2) (West Supp. 2018).

[6]In the body of their brief, the parents also appear to challenge the trial court's preliminary decision to grant temporary managing conservatorship to the Department soon after the Department filed its petition. The trial court's preliminary, interim order granting temporary managing conservatorship to the Department cannot be challenged in this appeal from the trial court's final order of termination. *See Melton v. Tex. Dep't of Family & Protective Servs.*, No. 03-08-00168-CV, 2010 WL 668917, at *10 (Tex. App.—Austin Feb. 25, 2010, no pet.) (mem. op.).

8

161.001(b)(1). *See* Tex. Fam. Code Ann. § 161.001(b)(1). In their fifth issue, they argue that the evidence is insufficient to show that termination is in Isaiah's best interest under section 161.001(b)(2). *See id.* § 161.001(b)(2).

In a termination case, the State seeks to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b) (West Supp. 2018); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985). When the State seeks to permanently sever the relationship between a parent and a child, it must first observe fundamentally fair procedures. *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)). We strictly scrutinize termination proceedings in favor of the parent. *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012); *E.R.*, 385 S.W.3d at 554–55; *Holick*, 685 S.W.2d at 20–21.

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001(b), .206(a); *E.N.C.*, 384 S.W.3d at 802. Evidence is clear and convincing if it "will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (West 2014); *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent-child relationship, the party seeking termination must establish by clear and convincing evidence that the parent's actions satisfy one ground listed in section 161.001(b)(1) and that termination is in the best interest of the child under section 161.001(b)(2). Tex. Fam. Code Ann. § 161.001(b);

*E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). In evaluating the evidence for legal sufficiency in parental termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction of the truth of the challenged ground for termination. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment. *Id.*

In reviewing the evidence for factual sufficiency, we give due deference to the factfinder's findings and do not supplant the trial court's judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief of the truth of the challenged grounds for termination. Tex. Fam. Code Ann. § 161.001(b); *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**Endangerment to Isaiah under section 161.001(b)(1)(E)**

In their third issue, Mother and Father argue that the evidence is legally and factually insufficient to support the trial court's finding under section 161.001(b)(1)(E) that they engaged in conduct that endangered Isaiah's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). Under section 161.001(b)(1)(E), a

child is endangered when he is exposed to loss or to injury by a parent's acts or failures to act. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). The relevant inquiry is whether evidence exists that the endangerment of the child's "well-being was the direct result of [the parent's] conduct, including acts, omissions, or failures to act." *In re M.E.-M.N.*, 342 S.W.3d 254, 262 (Tex. App.—Fort Worth 2011, pet. denied).

Termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* "It is not necessary, however, that the parent's conduct be directed at the child or that the child actually suffer injury. The specific danger to the child's well-being may be inferred from parental misconduct standing alone." *Id.* (citations omitted). In reviewing an endangerment finding under subsection (E), we consider parental conduct before and after the child's birth and before and after the child's removal from a parent's legal custody. *See id.*; *see also In re K.D.H.*, No. 14-17-00832-CV, 2018 WL 1720953, at *6 (Tex. App.—Houston [14th Dist.] Apr. 10, 2018, pet. denied) (mem. op.); *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g) ("The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent.").

11

A parent's acts that subject a child to a life of uncertainty and instability endanger the child's physical and emotional well-being. *In re A.J.M.*, 375 S.W.3d 599, 605 (Tex. App.—Fort Worth 2012, pet. denied) (op. on reh'g); *see In re R.B.*, No. 07-17-00187-CV, 2017 WL 4785328, at *2 (Tex. App.—Amarillo Oct. 19, 2017, pet. denied) (mem. op.) (explaining that a parent's conduct is endangering when it exposes a child to "risks and uncertainties"). More specifically, parents' engagement in domestic violence may endanger a child even if the violence did not occur in the child's presence, was not directed at the child, and did not cause actual injury to the child. *In re K.A.R.*, No. 04-17-00723-CV, 2018 WL 1733147, at *3 (Tex. App.—San Antonio Apr. 11, 2018, pet. denied) (mem. op.); *see also K.D.H.*, 2018 WL 1720953, at *7 ("In determining whether a parent endangered a child, a fact finder may consider the history of abuse between the parents, even outside the child's presence or before the child was born. Further, parent-on-parent physical abuse need not result in a conviction to be considered evidence of endangerment." (citations omitted)). Next, a parent's illegal drug use, including drug use that persists during termination proceedings, may constitute endangerment even if it happens outside the child's presence. *In re J.V.B.*, No. 01-17-00958-CV, 2018 WL 2727732, at *8 (Tex. App.—Houston [1st Dist.] June 7, 2018, pet. denied) (mem. op.); *see In re J.A.W.*, No. 02-08-00215-CV, 2009 WL 579287, at *4 (Tex. App.—Fort Worth Mar. 5, 2009, no pet.) (mem. op.) ("A parent's failure to remain drug-free while under the Department's supervision will support a finding of endangering conduct under subsection (E) even

12

if there is no direct evidence that the parent's drug use actually injured the child."). A parent's criminal activity that exposes the parent to incarceration may also endanger a child. *E.A.H. v. Tex. Dep't of Family & Protective Servs.*, No. 03-17-00816-CV, 2018 WL 2451824, at *4 (Tex. App.—Austin June 1, 2018, no pet.) (mem. op.). Finally, a parent's failure to participate in services intended to promote a continuing relationship with the parent's child establishes endangerment of the child's well-being. *In re A.N.*, No. 02-14-00206-CV, 2014 WL 5791573, at *18 (Tex. App.—Fort Worth Nov. 6, 2014, no pet.) (mem. op.).

The trial court heard evidence proving that Mother and Father repeatedly engaged in acts and failures to act that endangered Isaiah by subjecting him to an uncertain future and by exposing him to a permanent loss of a relationship with them. *See In re D.J.W.*, 394 S.W.3d 210, 222 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (explaining that a mother's drug use after removal of her child endangered the child because it "increased the risk that [the child's] relationship with his biological mother would be permanently severed"). As detailed above, the evidence showed that the parents have a history of engaging in domestic violence; that they have a pattern of using illegal drugs and continued to use them while their relationship with Isaiah was in jeopardy; that they each have a criminal history that had exposed them to incarceration and that continued during the Department's case; and that they did not complete the services required to maintain their relationship with Isaiah. Further, the evidence shows that the parents left Isaiah with the grandparents without developing

13

a plan of how the grandparents would provide for his needs and that the grandparents were not able to provide for his medical needs until they sought the Department's intervention.

Under the cases cited above, we conclude that this evidence, along with the remaining evidence admitted at trial, enabled the trial court to rationally form a firm belief or conviction that under section 161.001(b)(1)(E), Mother and Father engaged in conduct that endangered Isaiah's physical or emotional well-being. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). We therefore hold that the evidence is legally and factually sufficient to support termination under section 161.001(b)(1)(E), and we overrule Mother and Father's third issue.[7]

**Isaiah's best interest under section 161.001(b)(2)**

In their fifth issue, the parents contend that the evidence is legally and factually insufficient to support the trial court's finding under section 161.001(b)(2) that termination of their parental rights is in Isaiah's best interest. We generally presume that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In reviewing the trial court's best interest decision, we consider the entire record. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). The same evidence

---

[7]Having overruled the parents' third issue, because the Department must prove only one ground for termination under section 161.001(b)(1), we decline to address the parents' first, second, and fourth issues, which concern other grounds. *See* Tex. R. App. P. 47.1; *In re E.P.C.*, 381 S.W.3d 670, 684 n.3 (Tex. App.—Fort Worth 2012, no pet.).

may be probative of the subsection (b)(1) ground and best interest under subsection (b)(2). *Id.* at 249; *C.H.*, 89 S.W.3d at 28.

Factors that the factfinder may use in determining the best interest of the child include the desires of the child, the emotional and physical needs of the child now and in the future, the emotional and physical danger to the child now and in the future, the parental abilities of the individuals seeking custody, the programs available to assist these individuals to promote the best interest of the child, the plans for the child by these individuals or by the agency seeking custody, the stability of the home or proposed placement, the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one, and any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976) (citations omitted); *see E.C.R.*, 402 S.W.3d at 249 (stating that in reviewing a best interest finding, "we consider, among other evidence, the *Holley* factors").

The trial court could have rationally based its best-interest finding on the parents' continuing illegal drug use[8] before and during the Department's case, their criminal acts, their history of engaging in domestic violence, and their failure to complete services (including their failure to consistently visit Isaiah or maintain any

---

[8]Grandmother opined that the parents' drug use had affected "how they think and how they react." She testified that she did not know whether Mother or Father had ever sought treatment for their drug abuse.

15

significant contact with him).[9] The trial court could have reasonably found that these acts reflected poorly on Mother's and Father's current parental abilities and forecasted their inability to meet Isaiah's needs in the future. *See Holley*, 544 S.W.2d at 371–72; *In re L.M.*, No. 02-16-00127-CV, 2016 WL 5957030, at *15 (Tex. App.—Fort Worth Oct. 13, 2016, pet. denied) (mem. op.).

Further, the trial court could have rationally based its best-interest finding on evidence indicating that Isaiah would have a permanent, loving, nurturing home with the grandparents upon termination of the parents' parental rights. The evidence established that the grandparents wanted to adopt Isaiah. Grandmother testified that Isaiah is a fun, well-spirited, healthy child. She expressed a concern that if the trial court returned Isaiah to his parents' care, the parents "wouldn't put him first." While she opined that if Mother and Father proved that they were well, they should have an opportunity to stay involved in Isaiah's life, she also testified that she was ready to adopt Isaiah and asked the trial court to terminate the parents' parental rights.

Moore testified that Isaiah was "doing very well" in the grandparents' home, that he was comfortable there, and that he was "bonded to both of the caregivers."

---

[9]Harrison explained that she spoke with the parents "[m]any times" about the services they needed to complete to avoid termination of their parental rights. She spoke with Father in February 2018, and he told her that he could "get better help in San Antonio." According to Harrison, she attempted to contact Father several times after February 2018 through text messages, but he did not return the messages. Harrison last spoke with Mother in November 2017, and she eventually stopped attempting to contact Mother directly based on a request by Mother's counsel.

16

When asked why the Department was seeking termination of Mother's and Father's parental rights, Moore explained,

[Isaiah] needs permanency, safety, and stability, and he has that in his current placement. The parents have offered no permanency, safety, or stability throughout this entire case. They have not demonstrated any attempt to bond with the child, to be able to meet his basic needs or even their basic needs. They haven't shown that they're willing to put him above their desires to use drugs, and they haven't demonstrated that they're able to refrain from criminal activity or violence against one another.

Grandfather testified that he and Grandmother wanted to provide a permanent home for Isaiah by adopting him. He agreed with Grandmother that Father's parental rights should be terminated but that if Father and Mother later got their "li[ves] together," they should be a part of Isaiah's life.

Concerning Isaiah, Harrison testified,

He's doing great. I've seen him grow from a little 6-, 8-week-old infant into a little 1-year-old boy that's active. He plays hard. He laughs. He enjoys his environment. He loves his cousins. He loves his grandma and his grandpa. He's happy. He's healthy.

When Harrison was asked why she believed that the trial court should terminate Mother's and Father's parental rights, she testified,

[Mother] has not been able to show that she can provide . . . stable housing . . . . She's not shown us that she can be employed, that she can meet his housing, that she can -- has the ability to nurture him. . . . And then she states that [Father] abuses her; but, yet, she has returned to him. And we just don't believe that it's a safe environment at this time. . . .

. . . .

17

[Father] has -- he has had a job temporarily from what we understand. However, he's . . . never proven that to CASA. He has not maintained a safe or suitable home. He has continued with criminal activity. He also has some MHMR mental health history, and I was able to speak with him about that on December 6th. He understood verbally to me that he needed help; but, yet, he decided by February 7th that he did not need any help. And so with all of these factors, we believe that the parents' rights should be terminated and that custody be given to the Department.

We conclude that from this evidence, the trial court could have reasonably found that the grandparents had a superior ability to meet Isaiah's needs and provide him with a safe and stable home and could have rationally based its best-interest determination on that finding. *See Holley*, 544 S.W.2d at 371–72; *see also In re D.A.*, No. 02-15-00213-CV, 2015 WL 10097200, at *6 (Tex. App.—Fort Worth Dec. 10, 2015, no pet.) (mem. op.) (considering in a best-interest review that children were thriving in their grandmother's care, that she provided for their essential needs, and that she wanted to adopt them and provide them with a permanent, stable home).

For these reasons, we conclude that the trial court could have rationally reached a firm belief or conviction that termination of Mother's and Father's parental rights is in Isaiah's best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(2). We therefore hold that the evidence is legally and factually sufficient to support termination under section 161.001(b)(2), and we overrule the parents' fifth issue.

## Conclusion

Having overruled the parents' third and fifth issues, which are dispositive, we affirm the trial court's order terminating their parental rights to Isaiah.

/s/ Wade Birdwell
Wade Birdwell
Justice

Delivered: November 1, 2018