

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00036-CV

_____

IN THE INTEREST OF A.N. AND A.N., CHILDREN

On Appeal from the 322nd District Court
Tarrant County, Texas
Trial Court No. 322-678457-20

Before Sudderth, C.J.; Wallach and Walker, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

Appellant O.J. (Mother) appeals the termination of her parental rights to her twin girls, A.N. and A.N. (the Twins).[1] The trial court found that Mother had violated four statutory predicate grounds for termination,[2] and although Mother acknowledges that the evidence supports two of those predicate grounds, she challenges the legal and factual sufficiency of the other two: the two endangerment predicate grounds. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Because we conclude that there is sufficient evidence that Mother endangered the Twins' well-being through her course of conduct—her ongoing drug habit, her failure to complete the court-ordered treatment programs and service plan, and her inconsistent visitation—we will affirm the trial court's conduct-based endangerment finding and its termination order.

## I. Standard of Review

When reviewing the sufficiency of the evidence to support a termination finding, we ask whether a reasonable factfinder could have formed a firm belief or

---

[1]The trial court also terminated the parental rights of the Twins' father, but he does not appeal.

[2]The trial court found that Mother had "knowingly placed or knowingly allowed the [Twins] to remain in conditions or surroundings which endanger[ed] the[ir] physical or emotional well-being"; "engaged in conduct or knowingly placed the [Twins] with persons who engaged in conduct which endanger[ed] the[ir] physical or emotional well-being"; "constructively abandoned the [Twins]"; and "failed to comply with the provisions of [the] court order that specifically established the actions necessary for [Mother] to obtain the return of the [Twins]." *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (N), (O).

conviction that the finding was true. *In re Z.N.*, 602 S.W.3d 541, 545 (Tex. 2020); *In re A.C.*, 560 S.W.3d 624, 630–31 (Tex. 2018). Both legal and factual sufficiency turn on this question; the distinction between the two sufficiency analyses "lies in the extent to which disputed evidence contrary to [the] finding may be considered" in answering the question. *A.C.*, 560 S.W.3d at 630.

In our legal sufficiency analysis, we "look at all the evidence in the light most favorable to the finding," assuming that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could have done so and disregarding all evidence that a reasonable factfinder could have disbelieved. *Z.N.*, 602 S.W.3d at 545 (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)); *A.C.*, 560 S.W.3d at 630–31. "Factual sufficiency, in comparison, requires weighing disputed evidence contrary to the finding against all the evidence favoring the finding" to determine if "in light of the entire record, the disputed evidence a reasonable factfinder could not have credited in favor of a finding is so significant that the factfinder could not have formed a firm belief or conviction that the finding was true." *A.C.*, 560 S.W.3d at 630–31; *see In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009) ("When the factual sufficiency of the evidence is challenged, only then is disputed or conflicting evidence under review.").

There is overlap between the legal and factual sufficiency determinations; if the evidence is factually sufficient, it is necessarily legally sufficient. *In re A.O.*, No. 02-21-00376-CV, 2022 WL 1257384, at *8 (Tex. App.—Fort Worth Apr. 28, 2022, no pet.

h.) (mem. op.); *In re A.S.*, No. 02-16-00076-CV, 2016 WL 3364838, at *7 (Tex. App.—Fort Worth June 16, 2016, no pet.) (mem. op.). Therefore, and because Mother challenges both legal and factual sufficiency, we will conduct a consolidated review. *See A.O.*, 2022 WL 1257384, at *8 (doing similarly).

## II. Discussion

To terminate a parent–child relationship, the Department must offer legally and factually sufficient clear and convincing evidence to prove two elements: (1) that the parent's actions satisfy at least one statutory predicate ground listed in Family Code Section 161.001(b)(1) and (2) that termination is in the child's best interest. Tex. Fam. Code Ann. §§ 161.001(b)(1), (b)(2), .206(a), (a–1); *In re J.F.-G.*, 627 S.W.3d 304, 312 (Tex. 2021); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). The trial court found that Mother's actions satisfied four statutory predicate grounds and that termination was in the Twins' best interest. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E), (M), (O), (b)(2). Mother challenges two of the four predicate grounds; she does not challenge the other two, nor does she challenge the best interest finding. Generally, "[t]o affirm a termination judgment on appeal, a court need uphold only one [predicate] termination ground," plus the best interest finding. *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019). The disposition of the appeal is thus not at issue—the termination of Mother's parental rights to the Twins can be upheld on either of the unchallenged predicate grounds.

Normally, we would stop there. *See* Tex. R. App. P. 47.1. But the two predicate grounds that Mother challenges involve her endangerment of the Twins by their environment and by her conduct in violation of Subsections (D) and (E) of Section 161.001(b)(1). Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E). Because such endangerment findings can serve as predicate grounds for terminating Mother's parental rights to other children, *see id.* § 161.001(b)(1)(M), and because Mother's "fundamental liberty interest at stake outweighs the [S]tate's interest in deciding only what is necessary for final disposition of the appeal," *N.G.*, 577 S.W.3d at 237, we must address at least one of the two challenged endangerment findings, even though the findings may not be dispositive. *In re C.W.*, No. 02-21-00252-CV, 2022 WL 123221, at *3 n.5 (Tex. App.—Fort Worth Jan. 13, 2022, no pet.) (mem. op.); *In re J.B.*, No. 02-21-00239-CV, 2021 WL 6144074, at *20 (Tex. App.—Fort Worth Dec. 30, 2021, no pet. h.) (mem. op.) (similar). Addressing both (D) and (E) is not necessary, though, unless neither withstands appellate review. Affirming one renders the other moot. *C.W.*, 2022 WL 123221, at *3 n.5; *In re E.C.*, No. 02-20-00022-CV, 2020 WL 2071755, at *5 (Tex. App.—Fort Worth Apr. 30, 2020, no pet.) (mem. op.); *In re T.C.*, No. 02-19-00291-CV, 2019 WL 6606172, at *1 n.3 (Tex. App.—Fort Worth Dec. 5, 2019, pet. denied) (mem. op.).

Here, we need only address one: Subsection (E), the conduct-based endangerment finding, withstands appellate review. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E).

5

## A. The Law on Conduct-Based Endangerment

Subsection (E) requires a finding that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endanger[ed] the physical or emotional well-being of the child." *Id.* To "'[e]ndanger' means to expose to loss or injury, to jeopardize." *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *A.O.*, 2022 WL 1257384, at *8; *J.B.*, 2021 WL 6144074, at *21.

Conduct-based endangerment under Subsection (E) requires more than a "single act or omission"; it requires a "voluntary, deliberate, and conscious course of conduct." *J.B.*, 2021 WL 6144074, at *21; *In re R.H.*, No. 02-20-00396-CV, 2021 WL 2006038, at *13 (Tex. App.—Fort Worth May 20, 2021, no pet.) (mem. op.). As a course of conduct, evidence of endangerment under Subsection (E) "is not limited to actions directed towards the child," *J.F.-G.*, 627 S.W.3d at 315 n.43 (quoting *J.O.A.*, 283 S.W.3d at 345), and may include "actions before the child's birth, actions while the child is not in the parent's presence, and actions while the child is in the Department's custody." *See In re C.Y.*, No. 02-21-00261-CV, 2022 WL 500028, at *2 (Tex. App.—Fort Worth Feb. 18, 2022, no pet.) (mem. op.). "[S]uch actions may 'create an inference that similar conduct could recur and further jeopardize a child's well-being.'" *Id.* (quoting *In re M.W.*, No. 02-21-00146-CV, 2021 WL 3679247, at *4 (Tex. App.—Fort Worth Aug. 19, 2021, pet. denied) (mem. op.)).

6

## B. The Evidence of Mother's Conduct-Based Endangerment

The Department presented evidence that Mother's course of conduct—her drug habit, failure to complete her court-ordered treatment programs and service plan, and failure to consistently visit the Twins—endangered the Twins' well-being.

### 1. Drug Habit

Mother's drug habit was the primary component of her endangering conduct. Mother admitted to the Department that she had a history of cocaine and marijuana use and that because of her drug use, the Department had already placed Mother's four other children with relatives. She tested positive for marijuana while she was pregnant with the Twins. Mother admitted that she had used marijuana during her pregnancy, but she claimed that the marijuana use had occurred before she actually knew that she was pregnant.[3] "Illegal drug use during pregnancy can support a charge that the mother has engaged in conduct that endangers the physical and emotional welfare of the child." *In re M.B.*, No. 02-15-00128-CV, 2015 WL 4380868, at *12 (Tex. App.—Fort Worth July 16, 2015, no pet.) (mem. op.); *see M.W.*, 2021 WL 3679247, at *5 (affirming Subsection (E) finding based in part on evidence that mother had "admitted to taking controlled substances while pregnant" and that the baby had tested positive for drugs at birth).

---

[3]The Twins were born in November 2019 and spent the first month of their lives in the NICU, although there was no evidence as to why. By early December, the hospital had referred Mother's case to the Department. The Twins were removed from Mother's care in March 2020.

Mother argues, though, that there is no evidence that she "knowingly" endangered the Twins because she told the Department that she had "stopped using marijuana when she learned she was pregnant." But "[s]cienter is not required for an appellant's own acts [to constitute endangerment] under [S]ection 161.001(b)(1)(E)." *A.O.*, 2022 WL 1257384, at *11 (quoting *In re I.D.G.*, 579 S.W.3d 842, 851 (Tex. App.—El Paso 2019, pet. denied) (op. on reh'g)); *see In re M.N.G.*, 147 S.W.3d 521, 536 (Tex. App.—Fort Worth 2004, pet. denied) (op. on reh'g) (noting that "scienter is . . . required under [S]ubsection (E) [only] when a parent places the child with others who engage in an endangering course of conduct"). Moreover, the trial court was not required to believe Mother's statement to the Department that she had stopped using marijuana when she learned that she was pregnant. *Cf. In re J.P.B.*, 180 S.W.3d 570, 573–74 (Tex. 2005) (reiterating that the appellate court must defer to the factfinder's reasonable determination of credibility issues, and noting that the factfinder could have disbelieved the father's testimony "that he did not know how [his child] was injured"); *In re C.W.*, No. 02-21-00340-CV, 2022 WL 1155908, at *2 n.2 (Tex. App.—Fort Worth Apr. 19, 2022, pet. filed) (mem. op.) (noting that determining "[w]hom to believe . . . was the jurors' prerogative").

And a reasonable factfinder could have doubted Mother's alleged abstention from marijuana, given that Mother's continued use of drugs after the Twins' birth contributed to their emergency removal. Mother tested positive for marijuana only a month after the Twins were born, while they were still in her care. And although

8

Mother told the Department that she would stop using drugs and submit to drug tests, she refused many of the subsequently requested drug tests, and when she finally relented, she tested positive for a concoction of marijuana and other drugs: cocaine, opiates, and oxycodone. At that time, the Twins were approximately three months old, and Mother was already on a pre-removal Department plan that limited her contact with the Twins due to her ongoing drug habit. Whether the factfinder viewed these post-birth test results as a return to drugs after a brief reprieve during pregnancy (as Mother claims) or as a demonstration that Mother's drug habit had never ceased (as the trial court was entitled to believe), the tests confirmed that she was on drugs when she was or should have been caring for the infant Twins.[4] *See In re C.W.*, No. 02-14-00274-CV, 2014 WL 7139645, at *5 (Tex. App.—Fort Worth Dec. 12, 2014, no pet.) (mem. op.) (rejecting argument that evidence of Subsection (E) was insufficient when parent claimed that she had stopped using drugs when she became aware of her pregnancy but she tested positive for drugs after child's birth and admitted using drugs after removal).

Mother acknowledges that there was evidence of her drug use both before and after the Twins' birth, but she contends that there was no evidence connecting her drug use to any actual danger. Her argument appears to equate Subsection (E) endangerment with actual injury, though. A course of conduct that "expose[d]" the

_____

[4]Although the Twins were at breastfeeding age, there is no evidence as to whether Mother breastfed the Twins while she was on drugs.

Twins "to loss or injury" is sufficient to satisfy Subsection (E)—"it is not necessary that . . . the child[ren] actually suffer[ed] injury." *Boyd*, 727 S.W.2d at 533. Mother's "drug use while pregnant endangered [the Twins] because [they] w[ere] exposed to the possibility of being born with adverse medical conditions." *In re M.D.V.*, No. 14-04-00463-CV, 2005 WL 2787006, at *3 (Tex. App.—Houston [14th Dist.] Oct. 27, 2005, no pet.) (mem. op.) (holding similarly when child was born with marijuana in her system but parent argued that there was no evidence of a resulting medical condition). We are not willing to entertain the premise "that there is some level of drug use while pregnant that is acceptable or harmless to the child." *C.W.*, 2014 WL 7139645, at *5 (affirming Subsection (E) finding and rejecting premise). And because "[n]arcotics can impair or incapacitate the user's ability to parent," *In re M.M.*, No. 02-21-00185-CV, 2021 WL 5227177, at *6 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.), Mother's "use of a mind-altering, illegal substance while [she was or should have been] caring for [the Twins] jeopardized or exposed [them] to loss or injury." *M.D.V.*, 2005 WL 2787006, at *4 (rejecting similar argument that there was "no evidence of how [the parent's] drug use while caring for her children endangered them"); *see In re A.D.A.*, No. 13-21-00229-CV, 2022 WL 89186, at *7 (Tex. App.—Corpus Christi–Edinburg Jan. 10, 2022, no pet.) (mem. op.) (recognizing that drug use "exposes the child to the possibility that the parent may be impaired or imprisoned" (quoting *In re D.J.W.*, 394 S.W.3d 210, 221 (Tex. App.—Houston [1st Dist.] 2012, pet. denied)); *In re M.M.*, No. 2-08-029-CV, 2008 WL 5195353, at *7 (Tex. App.—Fort

10

Worth Dec. 11, 2008, no pet.) (mem. op.) (affirming Subsection (E) finding based in part on evidence that the parent "admitted that she had used drugs . . . and had cared for [her child] while she had drugs in her system").

Plus, even after the Twins were removed and Mother was ordered by the trial court not to use drugs as a condition of the Twins' return, Mother did not stay clean. In May 2020, when the Twins were approximately six months old and Mother's termination case was already pending, Mother tested positive for cocaine and marijuana. And when the Department scheduled Mother for additional drug testing in September 2020, Mother refused to submit to the test, allowing the trial court to reasonably infer "that [she] was avoiding testing because [she] was using drugs." *C.Y.*, 2022 WL 500028, at *4 (quoting *In re J.W.*, No. 2-08-211-CV, 2009 WL 806865, at *4 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.), and applying similar inference where mother repeatedly refused drug tests). "[A] parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing a child, supports a finding [of endangering conduct]."[5] *Id.* at *3 (quoting *In re J.G.*, No. 02-21-00257-CV, 2022 WL 187983, at *9 (Tex. App.—Fort Worth Jan. 20, 2022, no pet.) (mem. op.)); *In re C.S.L.E.H.*, No. 02-10-00475-CV, 2011 WL 3795226, at *5 (Tex. App.—Fort Worth Aug. 25, 2011, no pet.) (mem. op.)

---

[5]"We do not hold or imply that drug use, standing alone, automatically demonstrates endangering conduct." *C.Y.*, 2022 WL 500028, at *4 n.10 (citing *In re L.C.L.*, 629 S.W.3d 909, 909–11 (Tex. 2021) (Lehrmann, J., concurring)).

(similar); *see M.M.*, 2021 WL 5227177, at *6 (affirming Subsection (E) finding based in part on evidence that mother "used illegal drugs even though she knew that her parental rights were in jeopardy, and after the . . . agreed orders, she used again").

## 2. Failure to Complete Treatment Programs and Service Plan

Mother also failed to complete the court-ordered drug treatment programs that could have helped address her habit. She completed a drug assessment and was referred to MHMR for drug education, but she attended only "a few classes" before stopping. *See C.Y.*, 2022 WL 500028, at *5 (affirming Subsection (E) finding based in part on parent's failure to attend or complete drug treatment programs); *M.W.*, 2021 WL 3679247, at *5 (affirming Subsection (E) finding based in part on evidence that the mother "was a longtime drug addict" and "was unable to stay clean"). And Mother's caseworker testified that, apart from the drug assessment, Mother did not show completion of any of the other court-ordered services outlined in her service plan as conditions for the Twins' return.[6] She was required, for example, to attend individual counseling, but she did not do so.

---

[6]In March 2020, when the trial court appointed the Department as the temporary managing conservator of the Twins, the court issued a temporary order that required Mother to "comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." The order expressly warned that compliance with the service plan was "necessary to obtain the return of the children" and that "failure to fully comply . . . may result in the restriction or termination of parental rights." [Capitalization altered.] Although Mother's service plan was not admitted into evidence at trial, it was part of the trial court's file. *See In re J.E.H.*, 384 S.W.3d 864, 869–70 (Tex. App.—San Antonio 2012, no pet.) (stating that the trial court cannot take judicial notice of the truth of

Mother does not appear to dispute that she failed to complete her court-ordered service plan. In fact, one of the unchallenged predicate grounds supporting the trial court's judgment is a finding under Subsection (O) that Mother "failed to comply with the provisions of a court order [incorporating the service plan] that specifically established the actions necessary for the mother to obtain the return of the children who have been in the permanent or temporary managing conservatorship of the Department." According to Mother's caseworker, Mother said that she "didn't have time" to participate in the court-ordered services. The trial court could "consider [Mother's] failure to complete [her] service plan as part of its endangering-conduct analysis." *J.G.*, 2022 WL 187983, at *9 (affirming Subsection (E) finding based in part on the father's "fail[ure] to complete most of the services in his service plan").

### 3. Failure to Attend Visitation

Mother's lapses extended to her visitations as well. She was offered weekly visitations with the Twins, and although she participated in Zoom visitations in May 2020, her participation fell off when the Department returned to in-person visitations in June. After that, she stopped attending or even scheduling visits for months at a

---

allegations but can "take judicial notice that it signed an order adopting the family service plan and what the plan listed as the necessary requirements" for the parent to regain custody, and if record is silent, "the trial court may be presumed to have taken judicial notice of the records in the court's file without any request being made and without an announcement in the record that it has done so").

time. Mother saw the Twins in person in June 2020, but she did not see them again until a virtual visitation three months later in September 2020. Then she allowed another six months to elapse before attending a visitation in March 2021. By the time of Mother's termination trial in October 2021, the Twins were less than three years old, and Mother had not visited them for the preceding ten months of their lives.

A parent's inconsistent visitation "can be very damaging" to a child, and "can emotionally endanger a child's well-being, supporting termination under [S]ubsection (E)." *D.L.G. v. Tex. Dep't of Fam. & Protective Servs.*, Nos. 03-20-00314-CV, 03-20-00315-CV, 2020 WL 6789208, at *5 (Tex. App.—Austin Nov. 19, 2020, no pet.) (mem. op.); *In re S.I.H.*, No. 02-11-00489-CV, 2012 WL 858643, at *6 (Tex. App.—Fort Worth Mar. 15, 2012, no pet.) (mem. op.) (affirming Subsection (E) finding and quoting expert testimony regarding the impact of a parent's lack of consistent contact with the child). "Mother's inconsistent attendance at her scheduled visitations with [the Twins thus] lends further support to the trial court's finding of endangering conduct." *C.Y.*, 2022 WL 500028, at *6 (affirming Subsection (E) finding based in part on mother's inconsistent attendance at visitations); *see J.G.*, 2022 WL 187983, at *9 (affirming Subsection (E) finding based in part on the father's failure "to attend visitations or check on his children's well-being").

## III. Conclusion

Whether we view the record in a light most favorable to the Subsection (E) finding or weigh the disputed evidence for and against the finding, *see A.C.*, 560

S.W.3d at 630–31, a reasonable factfinder could have concluded that Mother had engaged in a course of conduct that had endangered the Twins' physical or emotional well-being.[7] *See* Tex. Fam. Code Ann. § 161.001(b)(1)(E). The Department presented evidence that Mother had used drugs before, during, and after her pregnancy with the Twins, that she had failed to complete her court-ordered treatment programs and service plan, and that she had failed to consistently visit the Twins for a significant portion of their lives. *Cf. C.W.*, 2014 WL 7139645, at *6 (affirming Subsection (E) finding based in part on evidence "that [the m]other used drugs while pregnant with [the child], continued to use drugs after his removal, failed to use the formal recovery programs offered to her, and denied that she needed help addressing her drug use").

Accordingly, we hold the evidence is legally and factually sufficient to support the trial court's Subsection (E) finding, and we affirm the trial court's order terminating Mother's parental rights to the Twins. Tex. R. App. P. 43.2(a); *see* Tex. Fam. Code Ann. § 161.001(b)(1)(E).

---

[7]Mother also challenges aspects of the evidence related to the Twins' abusive father. Mother claims that the evidence of such abuse was "largely conclusory" and that there was no evidence as to the frequency of the violence. But Mother's caseworker testified that Mother admitted having been assaulted by the Twins' father on at least one occasion, and Mother does not cite any case law to support her implied contention that domestic violence exposes children to harm only if the violence occurs at a certain frequency. Regardless, even without the evidence of domestic violence, there was sufficient evidence to support the trial court's Subsection (E) finding.

/s/ Bonnie Sudderth

Bonnie Sudderth
Chief Justice

Delivered:  June 9, 2022