**Opinion issued January 8, 2026.**



In The

# Court of Appeals

For The

# First District of Texas

_____

**NO. 01-25-00539-CV**

_____

**IN THE INTEREST OF J.M.L.H., A CHILD**

---

**On Appeal from the 315th District Court**
**Harris County, Texas**
**Trial Court Case No. 2024-00721J**

---

**MEMORANDUM OPINION**

In this accelerated appeal, Mother challenges the trial court's order terminating her parental rights to her child, J.M.L.H.[1] Mother argues on appeal that (1) the evidence is legally and factually insufficient to support the trial court's finding that the Department of Family and Protective Services (the Department)

---

[1]  We refer to the parties using pseudonyms. *See* TEX. R. APP. P. 9.8(b)(2).

made reasonable efforts to return J.M.L.H. to Mother through a surrogate and (2) the due process rights of Mother and one of J.M.L.H.'s potential fathers were violated because the Department failed to search for or serve the potential father in advance of trial. We affirm.

## Background

This appeal concerns J.M.L.H., a child who was under two years old at the time of trial.

### A.    J.M.L.H.'s Mother and Father

Mother has four children including J.M.L.H. J.M.L.H.'s three elder siblings live with Mother's aunt.

Mother has a history of mental illness, with diagnoses that include anxiety, bipolar I disorder, mood disorder, depression, suicidal ideation, and psychosis, as well as schizoaffective disorder and/or schizophrenia.[2] Mother also has a history of substance abuse, and her medical records indicate a possible relation between at least some of her mental health and substance abuse issues. Mother has been diagnosed as abusing cocaine and ecstasy.

Mother's criminal history includes:

- An indictment in Georgia on two pending counts of cruelty to children in the first degree, stemming from charges that Mother left her four-year-old child in a hotel room without supervision and deprived the child of necessary

---

[2]    Mother testified that she has been diagnosed with schizoaffective disorder and not schizophrenia.

2

sustenance to the extent that the child was malnourished and the child's health and well-being were jeopardized;[3]

- A conviction of misdemeanor terroristic threat with the intent to place the complainant in fear of imminent serious bodily injury;

- A felony charge of aggravated assault with a deadly weapon;

- A felony charge of assault on a police officer;

- A felony charge of retaliation;

- A felony charge of harassment of a public servant; and

- A felony charge of assault on a contracted employee of the Harris County Jail.

The Department caseworker assigned to the case testified at trial that Mother had also threatened the caseworker on multiple occasions, accusing the caseworker of having removed J.M.L.H. from Mother without cause. For example, Mother "texted [the caseworker] a few times, stating that [the caseworker] was going to lose [her] . . . job and [her] life."

Mother believes that J.M.L.H.'s father could be one of four men, including Alleged Father 1 and Alleged Father 2. The fourth man is a stranger who sexually assaulted Mother.

---

[3] Mother testified that she left the child in the hotel room alone for 14 hours, but had asked the hotel's manager to keep an eye on the child. Mother also stated that the child had access to snacks and knew how to heat up food in the microwave.

The caseworker testified that, at the start of the Department's investigation, the only information the Department had regarding the identity of J.M.L.H.'s father was the name of Alleged Father 1. In her search for Alleged Father 1, the caseworker "called possible relatives," searched the Georgia Department of Corrections, spoke with the Georgia District 3 Attorney's Office, and visited a last-known location of Alleged Father 1. She was unable to make contact with Alleged Father 1, and Alleged Father 1 did not make contact with the Department. The caseworker spoke with Alleged Father 1's ex-wife, but the ex-wife had not spoken to Alleged Father 1 for about two years. J.M.L.H.'s guardian ad litem testified that Alleged Father 1 had not responded to attempts to contact him, had not visited J.M.L.H., had not made any provisions for J.M.L.H., and had not inquired as to her well-being. Mother has twice denied that Alleged Father 1 is J.M.L.H.'s father.

The caseworker testified that, shortly before trial, Mother had identified a second potential father, Alleged Father 2.[4] However, Mother had provided just Alleged Father 2's name and, though she said she would also provide a phone number for him, did not provide the phone number. While Alleged Father 2's name is somewhat unique, the caseworker did not make any efforts to locate him based just on his name.

---

[4]     Mother testified that she provided the name of Alleged Father 2 two weeks before trial.

**B.    J.M.L.H.'s Removal**

The caseworker testified that the Department began its investigation when J.M.L.H. was around two weeks old. Mother was living at a shelter called Mission of Yahweh at the time, "experiencing some postpartum" depression, "using substances such as methamphetamines," and "behaving in a concerning way."[5] The Department received a referral alleging neglectful supervision of two-week-old J.M.L.H. by Mother. On the day of the referral, Mother stated that she could not "have [J.M.L.H.] anymore" and that she wanted to "give the baby to her aunt in Georgia." Mother asked J.M.L.H. if she wanted to go to Georgia, and claimed that J.M.L.H., who was too young to speak, had responded that she did not want to go to Georgia. The Department's Child Protective Services (CPS) division's investigation concluded that there was "reason to believe" at least one allegation of neglectful supervision by Mother.

---

[5]    According to the Department, Mother's concerning behavior included: (1) not cooperating with the Department's investigation; (2) trying to hide J.M.L.H. from the Department, (3) behaving "in crisis"; (4) stating that she "wanted to go get raped by the father of [J.M.L.H.] again so that she [could] get pregnant by the white rapist white man outside"; (5) crying and yelling profanities while on the floor; (6) "stating that she needed to pray as she attempted to evade law enforcement"; (7) stating that she could "only deal with white policemen" and that her rights had been violated when, she claimed, "every race was sent except a white police officer"; and (8) stating that "there [was] nothing the law [could] do to her" because she had renounced her citizenship and J.M.L.H. "[did] not have a name or foot prints."

## C. Difficulties Communicating with Mother

The caseworker testified that, after J.M.L.H.'s removal, the caseworker had difficulties communicating with Mother. Initially, Mother wanted to speak to the Department only through Mother's attorney. Later, Mother at times had no phone service. Mother's threats to the caseworker were another obstacle. And at some point later, Mother was incarcerated for a couple of months.

J.M.L.H.'s guardian ad litem also testified that Mother had initially requested that the guardian ad litem contact Mother only through Mother's attorney. More recently, however, the guardian ad litem had been able to visit Mother at the county jail.

## D. Mother's Family Plan and Visitations

The Department prepared a "Family Plan" for Mother with the goal of reunifying Mother and J.M.L.H. Among other things, the Family Plan required that Mother maintain stable housing; verify her employment and income; maintain contact with the Department; avoid criminal activity; and undergo a substance abuse assessment, psychiatric evaluation, and psychological evaluation.

Mother had not completed any of the Family Plan requirements by the time of her incarceration. The caseworker was unable to determine whether Mother completed any of the Family Plan requirements subsequent to her incarceration. Mother attended a substance abuse program but did not provide a certificate of

completion. Mother did not complete the substance abuse assessment. Mother testified she had not completed the psychiatric evaluation or psychological evaluation included in her Family Plan, but stated that she had received a psychiatric evaluation in connection with J.M.L.H.'s removal. Similarly, while she had not completed a parenting class as required by her Family Plan, she had attended parenting classes in the past.

To the caseworker's knowledge, Mother had not seen J.M.L.H. since J.M.L.H. was removed from her care. The trial court suspended any visits in May 2024, stating: "Due to [Mother's] behavior at the CPS office visit, the Court **suspends** visitation . . . until such time when [Mother] demonstrates sobriety, is in compliance with all recommendations from a mental health provider, and is actively engaged in services with the Department." (Emphasis in original.) The caseworker's understanding was that there had been no visitations because Mother "showed up to a potential visit with J.M.L.H. and was able to bypass security guards and get into a secured area," where Mother "caused chaos by throwing staplers and phones." The caseworker testified that, after Mother's visitations with J.M.L.H. were suspended, Mother had made no efforts to try to keep in contact with J.M.L.H. through the caseworker.

**E.     Mother's Circumstances at Time of Trial**

At the time of trial, Mother was still incarcerated. The caseworker had visited Mother on a monthly basis in the Harris County Jail. At each visit, the caseworker would ask Mother for the names of her family members. Up until the last two of the caseworker's monthly visits before trial, Mother refused to provide those names. Up until that time, Mother had not always sought a relationship with J.M.L.H.

In the two months prior to trial, Mother's demeanor had "changed a lot." Mother stated that she had been taking her medications, and the caseworker could "tell a difference" when speaking to Mother. Though not all of Mother's concerning behaviors were gone, the caseworker had seen improvement. Mother had told the caseworker that Mother was going to complete in jail those of the Family Plan's requirements she could. Mother also for the first time shared the names of family members. At the time of trial, the caseworker's understanding was that Mother might soon be moved from jail to a drug rehabilitation program.

According to the Department, at the time of trial, Mother had not been able to demonstrate that she was employed and able to provide a safe and stable home for J.M.L.H. The Department had concerns about Mother's ability to address her own psychological needs. Mother had not been able to demonstrate that she could maintain her own mental health. Mother's medical records demonstrated that,

8

during her incarceration, she had not always complied with her prescriptions for medications, had tried to overdose on her medication,[6] and had engaged in self-harm.[7] At the time of trial, the Department thus still had concerns regarding Mother's ability to care for J.M.L.H. physically, financially, and emotionally if the two were reunited. As such, the Department's concurrent goals at the time of trial were for J.M.L.H. to be adopted by a relative or non-relative.

J.M.L.H.'s guardian ad litem testified at trial that Mother had been unable to demonstrate that she was able to meet J.M.L.H.'s basic needs. Mother was unable to rectify the conditions that led to J.M.L.H.'s removal, to earn an income or otherwise provide financially for J.M.L.H., to provide stable housing for J.M.L.H., or to provide permanency for J.M.L.H. The guardian ad litem had concerns regarding Mother's drug use and criminal activity. The guardian ad litem favored termination of Mother's parental rights.

Mother's hope at the time of trial was that J.M.L.H. could be placed in a "healthy environment" with a relative or family friend. Mother had at times sought to have a relationship with J.M.L.H. The Department remained open to J.M.L.H.'s being adopted by a relative. A possible placement with Mother's aunt had been

---

[6]     Mother testified that the incident referenced involved her snorting a medicine she was prescribed for seizures because she felt a seizure coming on.

[7]     The Department stated at trial that Mother "attempted to jump off the top bunk as recently as February 2025."

rejected based on concerns regarding the aunt's already having five or six children in her home (including J.M.L.H.'s three siblings), lacking the financial means to support an additional child, and lacking a support system. The Department was investigating a possible placement with one of Mother's sisters based on a suggestion by Mother a few days before trial. However, while J.M.L.H.'s guardian ad litem believed there was value in J.M.L.H.'s knowing her biological family, the guardian ad litem did not believe there was value in exploring further the option of a placement with Mother's sister.

## F. J.M.L.H.'s Circumstances at Time of Trial

At the time of trial, J.M.L.H. had been living with a foster mother—the same foster mother with whom J.M.L.H. had been initially placed when she was removed from Mother's care—for about a year. The placement was Foster Mother's first. Foster Mother testified at trial that, while it is just she and J.M.L.H. in her home, J.M.L.H.'s support system includes Foster's Mother's "strong community of friends and family that are in [Foster Mother's] life." Foster Mother's mother, who visits frequently from out of state, is Department-approved to stay with J.M.L.H. Foster Mother noted that J.M.L.H.'s teachers at the daycare J.M.L.H. attends also love J.M.L.H.

Foster Mother described J.M.L.H. as follows:

She is . . . really starting to become independent. She enjoys being silly. She likes to make people laugh. She is also very affectionate. So,

when there is someone she has an attachment to, whether it's a friend or family member, she loves to give them hugs and kisses. She likes to make animal sounds. She likes to run around in our yard and she is -- oh, and she loves reading books. So, we read books, like, all the time, about 20 minutes a day. It's, like, one of her favorite things to do.

Foster Mother testified that she "would love to" adopt J.M.L.H. and "be her mom forever." Foster Mother would like to see J.M.L.H. "grow up to have a community that loves her and friends and family" and to "have every opportunity to seek an education to pursue her interests [and] follow her dreams." Foster Mother was confident that she could meet J.M.L.H.'s needs into the future.

When the Department caseworker first contacted Foster Mother after the placement, Foster Mother was "very welcoming." According to the caseworker, by the time of trial, Foster Mother had bonded with J.M.L.H. and exhibited caregiving skills. Foster Mother took J.M.L.H. to doctors' appointments and stayed in contact with the Department regarding J.M.L.H.'s care. Foster Mother also had a support system.

Both the caseworker and J.M.L.H.'s guardian ad litem testified that Foster Mother was meeting all of J.M.L.H.'s basic needs. J.M.L.H. was "well taken care of" under Foster Mother's care. Foster Mother provided J.M.L.H. a "drug-free" and "safe and stable environment" in which J.M.L.H. has a routine and frequently attends Department-approved daycare. Foster Mother provided J.M.L.H. with a crib, highchair, and car seat.

J.M.L.H. has been with Foster Mother since she was two weeks old, and Foster Mother's home is the only home J.M.L.H. has known. J.M.L.H. was doing "very well" and "thriving" with Foster Mother, and neither the Department nor the guardian ad litem had any concerns about the placement. The guardian ad litem recommended at trial that J.M.L.H. stay in her current placement. "Everything appear[ed] to be going really well." J.M.L.H. had a "healthy, strong bond" with Foster Mother and was doing well in daycare. J.M.L.H. was developmentally on target. J.M.L.H. was loved by everyone, was walking, and was advancing in her milestones. J.M.L.H. was attached to Foster Mother and "fe[lt] loved" by Foster Mother. The caseworker believed that J.M.L.H.'s staying with Foster Mother was in J.M.L.H.'s best interest because J.M.L.H. was "taken care of," "loved," and "supported."

## G.    Mother's Trial Testimony

Mother testified at trial that she loved J.M.L.H. and did not want her parental rights terminated. She asked the trial court to leave J.M.L.H. with Foster Mother for the time being, while Mother is in custody. But she asked the trial court not to terminate her parental rights, and to permit the Department to explore Mother's sister and the man she believed to be J.M.L.H.'s father—Alleged Father 2, whose name she had provided to the caseworker shortly before trial—as potential caregivers to leave open the possibility that Mother could regain custody of

12

J.M.L.H. after the completion of her deferred adjudication program. Alleged Father 2 currently lives in Louisiana, but has a townhome in Georgia.

Mother had begun to take her medicine more frequently, noting that she previously "might have missed . . . eight months, ten days total." Complying with her medication has made Mother feel better. She testified that she was aware of community resources that are available to help her with any future mental health struggles, and knows to call 2-1-1 or a crisis hotline if necessary. Mother stated at trial that she believed that, with the benefit of the parenting and substance abuse classes she had taken, she is more equipped to respond to challenges than she was previously.

Mother stated that she had been substance-free for two years. While in custody, Mother had participated in a drug treatment program, but was removed from that program after a 45-day period of sobriety. During the program, Mother learned anger management, not to use drugs as a coping mechanism, and to avoid individuals who use drugs. Mother noted that her felony charge of Aggravated Assault with a Deadly Weapon occurred before she had learned about anger management and coping skills. She now better understands her own behavior and how to proceed moving forward. She stated that her behaviors have changed, as well as her understanding of the severity of those behaviors.

Mother testified that she would like an opportunity to reunite with J.M.L.H. Mother was working at a hair boutique—a type of work she had done previously. Mother believed she could make enough money at the hair boutique to provide for herself and J.M.L.H. Mother's support system included her older sister, with whom Mother had contact while in custody, and a woman who, at least for a time, served as a foster mother for Mother's other daughter.

Mother stated that, after she was released from custody, she planned to live with J.M.L.H.'s father and his sister. He had been working a warehouse job for three years, and Mother believed there would be enough space in the home for her and J.M.L.H. Mother planned to enroll J.M.L.H. in daycare, and would also have assistance from the support system she had mentioned.

## H.     Trial Court Judgment

On June 25, 2025, the trial court terminated Mother's parental rights under subsections 161.001(b)(1)(D), (E), (N), and (O) of the Texas Family Code, and found that the termination of Mother's parental rights was in J.M.L.H.'s best interest under subsection 161.001(b)(2). Under section 161.002 of the Texas Family Code, the trial court also terminated the parent-child relationship, "if any exists," between J.M.L.H. and Alleged Father 1 and between J.M.L.H. and

14

"respondent father unknown." The "respondent father unknown" appears to have been a reference to the stranger who sexually assaulted Mother.[8]

## Sufficiency of the Evidence

The first of Mother's two issues on appeal is her claim that there is legally and factually insufficient evidence supporting the trial court's finding under subsection 161.001(b)(1)(N)(i) of the Family Code that the Department made reasonable efforts to return J.M.L.H. to Mother.

## A.    Standard of Review

In a case to terminate parental rights under section 161.001 of the Texas Family Code, the Department must establish that (1) the parent committed one or more of the enumerated acts or omissions justifying termination and (2) termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Only one predicate finding under subsection 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The Department must prove both elements—i.e., both the statutorily prescribed predicate finding(s) and that termination is in the child's best interest—by clear and convincing evidence. *In re E.N.C.*, 384 S.W.3d 796, 803 (Tex. 2012). The Family Code

---

[8]    The Department first sought the termination of the parental rights of an "unknown" father over a year before trial. Mother testified that she identified Alleged Father 2 as J.M.L.H.'s potential father two weeks before trial.

defines "clear and convincing evidence" as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007.

When assessing the legal sufficiency of the evidence in a termination proceeding, we consider all evidence in the light most favorable to the trial court's finding and decide "whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see also City of Keller v. Wilson*, 168 S.W.3d 802, 817 (Tex. 2005) (discussing elevated standard of review in parental termination cases). We assume that any disputed facts were resolved in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. When "no reasonable factfinder could form a firm belief or conviction" that the matter on which the Department bears the burden of proof is true, we "must conclude that the evidence is legally insufficient." *Id*. In reviewing the evidence's factual sufficiency, we consider the entire record, including disputed evidence. *Id*. The evidence is factually insufficient if, considering the entire record, the disputed evidence that a reasonable factfinder could not have resolved in favor of the finding is so significant that the factfinder could not reasonably have formed a firm belief or conviction. *Id*.

We give due deference to the factfinder's findings, and we cannot substitute our own judgment for that of the factfinder. *See In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The factfinder is the sole arbiter when assessing the credibility and demeanor of witnesses. *See id.* at 109.

**B.    Analysis**

As noted above, only one predicate finding under subsection 161.001(b)(1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest. *A.V.*, 113 S.W.3d at 362. Because Mother does not challenge the sufficiency of the evidence supporting the trial court's predicate findings under subsections 161.001(b)(1)(D), (E), and (O) of the Family Code or the trial court's finding that termination was in J.M.L.H.'s best interest, we need not consider whether sufficient evidence supports the trial court's finding under subsection 161.001(b)(1)(N). *See A.V.*, 113 S.W.3d at 362 (in appeal in which appellant did not challenge trial court's predicate finding under subsection 161.001(b)(1)(Q), holding that supreme court did not need to consider whether trial court's predicate finding under another subsection was supported by factually and legally sufficient evidence for termination); *Fletcher v. Dep't of Family & Protective Services*, 277 S.W.3d 58, 64 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (in appeal in which appellant did not challenge trial court's possible predicate finding under subsection 161.001(b)(1)(N), holding that appellate court could not

consider "either the challenged grounds or the unchallenged ground and ha[d] no choice but to overrule the challenges that the appellant ha[d] chosen to assert"); *see also In re A.B.-G.*, No. 01-24-00509-CV, 2024 WL 4982500, at \*11–12 (Tex. App.—Houston [1st Dist.] Dec. 5, 2024, pet. denied) (mem. op.) (holding that rule requiring appellate court to review trial court's predicate findings under subsections 161.001(b)(1)(D) and (E) if challenged, even where another ground is sufficient for termination, does not apply when findings under (D) and (E) are not challenged).

We overrule Mother's first issue.

**Failure to Serve Alleged Father 2**

The second of Mother's two issues on appeal is her claim that the due process rights of Mother and those of one of J.M.L.H.'s potential fathers—Alleged Father 2—were violated because the Department failed to search for or serve Alleged Father 2 in advance of trial. As noted above, Mother testified that she identified Alleged Father 2 as a potential father of J.M.L.H. two weeks before trial. Mother told the caseworker that Mother would provide his phone number, but then failed to do so. The caseworker did not make any efforts to locate Alleged Father 2 based just on his name.

Mother argues that Alleged Father 2's due process rights were violated, and that "the trial court erred in rendering a termination order," because the statutory

prerequisites for the termination of the rights of an alleged biological father were not met as to Alleged Father 2. *See* TEX. FAM. CODE § 161.002. However, the trial court's judgment makes no reference to Alleged Father 2. While the trial court terminated the parent-child relationship, "if any exists," between J.M.L.H. and "respondent father unknown," Alleged Father 2 was not "unknown." When Mother first disclosed Alleged Father 2 as J.M.L.H.'s potential father, two weeks before trial, she also disclosed his name. The Department had sought termination of the parental rights of an "unknown" father—presumably the man who sexually assaulted Mother—beginning over a year prior to trial. Moreover, even if the trial court's judgment could be read as terminating the parental rights of Alleged Father 2, Mother does not have standing to challenge that termination. *See In re K.D.T.*, No. 14-22-00224-CV, 2022 WL 3093384, at \*4 n.1 (Tex. App.—Houston [14th Dist.] Aug. 4, 2022, pet. denied) (mem. op.) (holding that mother had no standing to challenge termination of father's parental rights).

Mother asserts that the "parents'" due process rights were violated because the Department failed to search for or serve Alleged Father 2 in advance of trial. While she uses the plural possessive, presumably to also reference her own due process rights, she has not identified or briefed any alleged violation of her own due process rights. The rules of appellate procedure contain specific requirements for briefing, including briefing in appeals from final decrees terminating a parent's

19

parental rights to their child. *See* TEX. R. APP. P. 38.1(f) (brief must state all issues presented for review), (h) (brief must contain clear summary of arguments), (i) (brief must contain clear argument for contentions made with appropriate citations to authority and record); *see also In re D.J.W.*, 394 S.W.3d 210, 223 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (rejecting under rule 38.1(i) mother's challenge to legal and factual sufficiency of finding under section 161.001, noting her brief contained no legal argument in support of those points); *In re K.C.B.*, 280 S.W.3d 888, 896 (Tex. App.—Amarillo 2009, pet. denied) (rejecting under rule 38.1(i) mother's challenge to finding under section 161.001, noting her brief contained no analysis of relevant facts or law). To the extent Mother had a complaint regarding an alleged violation of her own due process rights, she was required, among other things, to state concisely her complaint, provide succinct and clear argument for why her complaint has merit in fact and in law, and cite and apply authorities applicable to the lodged complaint along with appropriate record references. *See* TEX. R. APP. P. 38.1(f), (h), (i). By failing to adequately brief her claim that her due process rights were violated by the Department's failure to search for or serve Alleged Father 2 in advance of trial, Mother has waived this issue for appellate review. Even if this issue were properly before us, a party generally lacks standing to assert a due process violation based on improper service on another party. *In re Guardianship of V.A.*, 390 S.W.3d 414, 418 (Tex.

20

App.—San Antonio 2012, pet. denied); *see also Lemieux v. Harley*, No. 02-24-00009-CV, 2024 WL 3282209, at *4 (Tex. App.—Fort Worth July 3, 2024, no pet.) (mem. op.) (holding that guardian grandparents had no due process claim based on alleged failure to properly serve citation on ward in guardianship case that terminated their guardianship; reasoning that, while guardians may have been aggrieved by decision, they were not personally prevented from appearing and meaningfully participating in proceeding).

We thus overrule Mother's second issue.

## Conclusion

We affirm the trial court's decree of termination.

Amparo "Amy" Guerra
Justice

Panel consists of Justices Guerra, Caughey, and Dokupil.